ASHLAND LUMBER COMPANY, Appellant, vs. DETROIT SALT COMPANY and others, Respondents.

SAME, Respondent, vs. SAME, Appellants.

*March 12—April 1, 1902.*

*Contracts: Construction: Breach: Instructions to jury: Evidence: Statutes: Foreign corporations: Conditions on which may transact business in Wisconsin: Validity: Constitutional law: Partnership.*

1. A lumber company contracted with a partnership, engaged in the cooperage business, to furnish "slabs, edgings, and trimmings as they came from its mills," for which the lumber com-

Ashland Lumber Co. v. Detroit Salt Co. 114 Wis. 66.

pany was to be paid sixty cents per 1,000 pieces of headings manufactured therefrom. The partnership guaranteed that the lumber company should receive $25 for each 200,000 feet of lumber manufactured. *Held*, that there was no agreement or guaranty, express or implied, that the lumber furnished should be of dimensions and quality sufficient to enable the partnership to manufacture any specified number of pieces of headings from each and every 200,000 feet of lumber, and that instructions to the effect that there was such agreement were erroneous.

2. In such case, although inconsistent and out of harmony with said portions of the charge which were erroneous, it is not error to charge the jury that the lumber company was "bound to furnish such material, of the same or similar character, dimensions, and quantities, in the ordinary course of business, as they had been and were manufacturing at the date of this written contract," and, further, that the partnership had a right, under the contract, to assume that the plaintiff would not materially change its manner of slabbing its logs and trimming its lumber, although there was no express stipulation to that effect.

3. Under such contract, plaintiff would be entitled to recover according to the terms of the guaranty, until failure to so furnish, or until there was a change in the manner of slabbing or trimming, and thereafter for what the material received was reasonably worth.

4. In such case it is not error to allow the partnership to show an estimate, made prior to said contract, of the number of pieces of headings which could be realized from the kind of slabs, edgings, and trimmings then coming from the lumber company's mill, and that the contract was made with reference to such conditions.

5. Sec. 1770*b*, Stats. 1898, as amended by ch. 351, Laws of 1899, provides conditions on which foreign corporations may do business within Wisconsin; imposes penalties for failure to comply therewith; and declares that contracts made by such corporations, affecting its personal liability, or relating to property within this state, before it complies with the statute, "shall be wholly void on its behalf . . . but shall be enforceable against it." *Held*, that the words "wholly void," in said section, mean void absolutely, and not merely voidable at the option of the other party.

6. Such statute involves no question of foreign or interstate commerce, and is valid, however harsh its provisions may seem to be.

7. Where a contract is made by a partnership consisting of M. and two foreign corporations, which had failed to comply with the requirements of sec. 1770b, Stats. 1898, as amended, the contract being void as to the corporate members of the partnership, M., as an individual, acquires no rights thereunder.

APPEALS from a judgment of the circuit court for Ashland county: JOHN K. PARISH, Circuit Judge. *Reversed.*

It appears from the record, and is undisputed, that during the times mentioned the plaintiff was a corporation created and organized under the laws of Wisconsin, having a sawmill and place of business at Ashland; that during the same times the defendant *Detroit Salt Company* was a corporation created and organized under the laws of Michigan, and having its principal office at Detroit, in that state, and the defendant *Thompson Bros.* was also a corporation created and organized under the laws of Michigan, having its principal office at St. Clair, in that state; that during the times mentioned the two Michigan corporations and the defendant *A. Miller, Jr.,* constituted a copartnership doing business as manufacturers of heading and staves, under the firm name of Ashland Cooperage Company, at Ashland; that May 10, 1899, the plaintiff entered into a written contract with the Ashland Cooperage Company, wherein and whereby the plaintiff agreed to furnish slabs, edgings, and trimmings as they came from the plaintiff's mill, and the Ashland Cooperage Company agreed to take the same from the elevators, and to manufacture the same into heading, paying the plaintiff sixty cents per 1,000 pieces for all manufactured, guarantying that the number of pieces manufactured would net the plaintiff $25 for each 200,000 feet of lumber manufactured—the size of the pieces to be six and one-half inches by five eighths inches by twenty inches; the plaintiff to furnish piling room for drying purposes, dock room for shipping, and the necessary power in the mill for manufacturing. The Ashland Cooperage Company were not, however, to interfere with any machinery then in

operation in said mill. The Ashland Cooperage Company were to furnish their own machinery, and make all connections necessary for the manufacture of said stock, and to properly dispose of all refuse that the defendants might make. Payment to be made by the Ashland Cooperage Company on the 1st day of each month for all stock manufactured the preceding month. Such contract was to be in force during the sawing seasons of 1899, 1900, and 1901.

September 28, 1899, the plaintiff commenced this action to recover $1,395, as the balance then due the plaintiff from the defendants under such contract, with interest from that date. In addition to alleging the formal facts mentioned, and the substance of such contract, the complaint alleged, in effect, that from June 23, 1899, to July 31, 1899, there was manufactured at the plaintiff's mill 5,120,000 feet of lumber, and in August, 1899, there was manufactured at the plaintiff's mill 4,080,000 feet of lumber, and from September 1, 1899, to September 26, 1899, there was manufactured at the plaintiff's mill 3,280,000 feet of lumber, making in all 12,480,000 feet of lumber; that there became due and payable from the defendants to the plaintiff therefor, according to the terms of such contract, at the rate of $25 for each 200,000 feet of lumber manufactured, the sum of $1,560, upon which the defendants paid to the plaintiff the sum of $165 prior to July 31, 1899, and that there remained due and payable from the defendants to the plaintiff under the terms of the contract, before the commencement of this action, the sum of $1,395, no part of which had been paid; that the defendants had broken the terms of the contract, and refused to perform the same on their part, by neglecting and refusing to pay the sums becoming due as aforesaid under the contract on the 1st of each month for the stock manufactured the preceding month, and that the plaintiff had fully performed the contract and all the conditions and terms thereof on its part to be performed.

The defendants answered jointly, and expressly admitted

the incorporation of the plaintiff and two of the defendants, and the partnership of the three defendants, as alleged in the complaint, and the payment to the plaintiff by the defendants of $165 prior to August 10, 1899, but expressly denied any knowledge or information sufficient to form a belief as to whether the quantity of lumber manufactured at the plaintiff's mill was as alleged in such complaint during all or any or either of the periods therein mentioned, and, except as specifically admitted, denied each and every allegation of the complaint. The defendants further answered, and for a second and separate defense, and as a counterclaim, alleged, in effect, the incorporation and organization of the plaintiff and two of the defendants, and the making of the contract, as mentioned; that the plaintiff thereby agreed and became bound, in consideration of the promises of the defendants therein contained, to furnish to the defendants, at its sawmill, slabs, edgings, and trimmings of such kind and quantity as to yield 41,667 pieces of heading for each and every 200,000 feet of said lumber during the sawing seasons of 1899, 1900, and 1901, and to furnish to the defendants, for the purpose of manufacturing such heading, sufficient and necessary power, so that the heading machinery of the defendants would be properly driven and could be properly operated, and to provide for and furnish to the defendants sufficient room for handling such material, and for storing such product on its dock preparatory to shipping; that immediately upon the execution of the contract the defendants shipped to Ashland, and set up in the plaintiff's sawmill, the requisite machinery for the carrying out of the contract on their part, and duly performed all the conditions of that contract on their part to be performed, and June 26, 1899, the defendants began operations under that contract; that the plaintiff did not at any time furnish to them sufficient or necessary power for the manufacturing of such heading, or for the driving and operating of the defendants' heading ma-

chinery; that, for want of power, they could not, prior to
August 28, 1899, manufacture more than 11,000 pieces of
heading per day of ten hours, and that they were during that
period equipped with men and machinery and fully prepared
to manufacture on an average of 19,000 pieces of heading
per day of ten hours, and would have done so if the plaintiff
had furnished them sufficient or necessary power to properly
operate their heading machinery, as it agreed to do; that the
plaintiff failed, neglected, and refused to furnish the de-
fendants at any time after August 28, 1899, slabs, edgings,
and trimmings, or either or any of said kinds of material, in
such quantity or of such kind as to yield 41,667 pieces of
heading, or a greater number than 12,500 pieces, for every
200,000 feet of lumber manufactured by the plaintiff after
that date; that the plaintiff did not furnish to the defendants
sufficient or necessary room for the handling of such ma-
terial, or the storing of such product on its dock; that for
the purpose of thwarting the performance of the contract on
their part, and compelling them to throw up the same, the
plaintiff from and after August 28, 1899, until the attach-
ment of the defendants' heading machinery, wilfully sawed
slabs at its sawmill in such manner and of such dimensions
as to make them practically worthless for the purpose of
heading, and so as to render it impossible to get from them
more than thirty per cent. of the quantity of heading which
the plaintiff by its contract was required to furnish to the
defendants; that in pursuance of the plaintiff's purpose
the plaintiff wilfully hampered and embarrassed the de-
fendants in the prosecution of their work under the contract,
by depriving them of the necessary room for the handling of
the material and interfering with their employees, and Sep-
tember 28, 1899, caused to be issued out of the circuit court
a writ of attachment, and caused the same to be levied on all
the property of the defendants at the plaintiff's mill, includ-
ing the heading manufactured by the defendants as above de-

scribed and the defendants' heading machinery, and caused the defendants' heading mill to be seized by the sheriff under such writ of attachment, and the defendants to be excluded from possession thereof; that by reason of the premises the defendants were disabled from further performance of the contract, and were compelled to abandon the same; that the contract was a valuable one for the defendants; and that by the plaintiff's breaches of that contract the defendants had been deprived of the profits which would have accrued to them by virtue thereof, to their damage in the sum of $35,000.

The plaintiff, replying to such counterclaim, alleged, in effect, that the *Detroit Salt Company* and *Thompson Bros.,* parties to such contract, were at the time of making the same, and ever since had been, respectively, corporations organized under and in pursuance of the laws of Michigan, with their principal offices and places of business in Michigan, as stated; that said corporations had never been organized under the laws of Wisconsin, and that neither of said corporations was created solely for religious or charitable purposes; that neither of said corporations had been a fraternal or beneficiary corporation, or a corporation furnishing life or casualty insurance upon the mutual or assessment plan, or upon any other plan, and that said corporations were not, nor were either of them, organized for any one or more of said purposes, and that neither of said corporations had at the time of making the said contract, or at any time prior thereto, or at any time prior to the commencement of this action, caused to be filed in the office of the secretary of state of Wisconsin a duly authenticated copy, or any copy, of their, or either of their, charters or articles of incorporation, and that said contract affected the personal liability of the defendant corporations, and related to property within this state; and that the defendant corporations transacted business in this state under said contract, and that because of the

failure of said corporations to file, as aforesaid, a duly authenticated copy of their articles of incorporation as aforesaid, said contract was and is wholly void and unenforceable in favor of said corporations, as against the plaintiff; and, except as thereinbefore admitted or explained, the plaintiff denied each and every allegation in said counterclaim contained.

At the close of the trial the jury returned two verdicts, to the effect that they found in favor of the defendants on their counterclaim, and assessed their damages at $2,750 (that is to say, $750 for the sawing season of 1899, $1,000 for the sawing season of 1900, and $1,000 for the sawing season of 1901); and upon the issues made by the complaint and the defensive portion of the answer, they found in favor of the defendants, and that the plaintiff had no cause of action against them. Judgment was entered thereon in favor of the defendants and against the plaintiff for $2,750 damages, and for $338.83 costs. The plaintiff appeals to this court from the whole judgment. The defendants appeal from that portion of the judgment wherein they recover of the plaintiff $2,750 damages.

*R. Sleight,* for the plaintiff.

For the defendants there was a brief by *Lamoreux & Shea,* attorneys, and *Joseph H. Clark,* of counsel, and oral argument by *Mr. Clark.* They contended, *inter alia,* that if under sec. 1170*b,* Stats. 1898, the contract is absolutely void and a nullity and incapable of ratification by either party, the statute is unconstitutional, but that if the word "void" is construed as "voidable" it can be sustained as a constitutional enactment. *Mut. Ben. L. Ins. Co. v. Winnie,* 20 Mont. 20. The words "void" and "voidable" are often used in statutes indiscriminately. If the word "void" concerns the public good it is generally considered to mean void; but if it prohibits, for the purpose of securing private rights of interested parties, it is considered to mean voidable only.

*Anderson v. Roberts,* 18 Johns. 515; *Somes v. Brewer,* 2 Pick. 184; *Crocker v. Bellangee,* 6 Wis. 668; *Bromley v. Goodrich,* 40 Wis. 139; *Pearson v. Chapin,* 44 Pa. St. 15; Bigelow, Estoppel (4th ed.), 656, 657; *Oregonian R. Co. v. O. R. & N. Co.* 10 Sawyer, 464; *Robinson v. Pebworth,* 71 Ala. 240. Contracts made by a corporation not having complied with such law are not void, but voidable. *Am. L. & T. Co. v. E. & W. R. Co.* 37 Fed. 242; *Sherwood v. Alvis,* 83 Ala. 115; *Schierman v. Beckett,* 88 Ind. 52; *Day v. Wilson,* 83 Ind. 463; Thompson, Corp. secs. 7952, 7959; *Crouse v. Holman,* 19 Ind. 35; *Wait v. Maxwell,* 5 Pick. 217; *Allis v. Billings,* 6 Met. 415; *Arnold v. Richmond I. Works,* 1 Gray, 434. Where a citizen of the state has made a contract with a foreign corporation which has not complied with the law, and received benefit therefrom, he is estopped from avoiding the contract on that ground. *Farmers' L. & T. Co. v. C. & N. P. R. Co.* 68 Fed. 412; *Gamble v. Caldwell,* 98 Ala. 577; *Washburn M. Co. v. Bartlett,* 3 N. Dak. 138; *Holmes Co. v. Barnard,* 15 Weekly N. Cases, 110; *Kilgore v. Smith,* 122 Pa. St. 48; *La France F. E. Co. v. Mt. Vernon,* 9 Wash. 142; *Rathbone, Sard & Co. v. Frost,* 9 Wash. 162; *Watts-Campbell Co. v. Yuengling,* 51 Hun, 302; *Newburg P. Co. v. Weare,* 27 Ohio St. 343; *White River I. Co. v. S. W. Imp. Asso.* 55 Ark. 625; *Eastern B. & L. Asso. v. Bedford,* 88 Fed. 7; *Barnes v. People ex rel. Moloney,* 168 Ill. 425.

Cassoday, C. J. The plaintiff's cause of action is based upon the guaranty of the defendants contained in the contract, to the effect that the number of pieces of heading manufactured by the defendants, of the size therein mentioned, would, at sixty cents per 1,000 pieces, net the plaintiff $25 for each 200,000 feet of lumber manufactured by the plaintiff. To fulfill such guaranty, the plaintiff claims that the defendants were bound to pay for 41,667 pieces of heading for each and every 200,000 feet of lumber manufactured by

the plaintiff. But such heading was to be manufactured from "slabs, edgings, and trimmings," as they came from the plaintiff's mill. True, as claimed by counsel for the plaintiff, the contract nowhere required the plaintiff to furnish "slabs, edgings, and trimmings" of dimensions and quality suffi- cient to enable the defendants to manufacture 41,667 pieces of heading for each and every 200,000 feet of lumber manu- factured by the plaintiff; nor do we think any such agree- ment or guaranty is implied in the contract. In so far as the charge of the court is to that effect, we think it was errone- ous. The simple agreement is that the plaintiff shall fur- nish "slabs, edgings, and trimmings *as they came from*" its mill, and the defendants were to take the same from the elevators. Counsel for the plaintiff, in his brief, concedes that the plaintiff agreed to furnish "slabs, edgings, and trim- mings as they came from the mill, *in the ordinary course of business,* for stock for the defendants to make heading out of." This is said by way of argument in construing the con- tract, and so we assume it relates to the time of making the contract.

In charging the jury in regard to the custom in Ashland "as to the methods and manner of slabbing logs," they were told to consider such evidence, "especially as to the manner in which the plaintiff was slabbing its logs immediately be- fore and at the time the contract was made between the parties to this contract;" and that the plaintiff was "bound to furnish such material, of the same or similar character, dimensions, and quantities, in the ordinary course of busi- ness, as they had been and were manufacturing at the date of this written contract, May 10, 1899." And the court fur- ther charged the jury that "the defendants had a right, under the contract, to assume that the plaintiff would not mate- rially change its manner of slabbing its logs and trimming its lumber, although there is no express stipulation written in said contract that they should so continue." We find no

error in such portions of the charge, although inconsistent and out of harmony with other portions of the charge above referred to. If, after making the contract, the plaintiff substantially changed its manner of slabbing its logs and trimming its lumber, so as to materially lessen the dimensions and quantity of such "slabs, edgings, and trimmings," to the substantial damage of the defendants, then thereafter the defendants were relieved from carrying out their part of the contract by paying according to the terms of the guaranty, but would only be liable thereafter for what the material received by them was reasonably worth. Whether there was such change, and, if so, when, is a question of fact for the jury. The same is true if the plaintiff failed to furnish the defendants piling room for drying purposes, dock room for shipping, or the necessary power in the mill for manufacturing such heading, as agreed in the contract. But until such failure to so furnish, or such change in the manner of slabbing and trimming, we perceive no reason why the plaintiff cannot recover according to the terms of the guaranty, and thereafter for what the material received by the defendants was reasonably worth.

2. Such being the true construction of the contract, we perceive no error in allowing the defendant *Miller* to testify to the effect that, prior to the signing of the contract, he went to the plaintiff's mill, and observed its operation, and made calculations as to the number of pieces of heading which could be realized from the slabs, edgings, and trimmings then coming from the mill, and then and there estimated the same at 43,000 pieces of heading from each 200,000 feet of lumber cut at the mill, and that the contract was made with reference to such conditions.

3. It is contended that the defendants were improperly allowed to take anything by their counterclaim, by reason of the failure of such Michigan corporations to comply with the statutes of this state (sec. 1770*b*, Stats. 1898, as amended

by ch. 351, Laws of 1899). That section provides, among other things:

"No corporation . . . incorporated or organized otherwise than under the laws of this state . . . shall transact business or acquire, hold or dispose of property in this state until such . . . corporation shall have caused to be filed in the office of the secretary of state a duly authenticated copy of its charter . . . and all amendments thereto which may be made while it shall continue to do business therein. . . . Every contract made by or on behalf of any such . . . corporation . . . affecting the personal liability thereof or relating to property within this state, before it shall have complied with the provisions of this section, *shall be wholly void* on its behalf and on behalf of its assigns, but shall be enforceable against it or them."

No question is made but that a duly authenticated copy of the charter of each of such corporations should have been filed with the secretary of this state before it attempted to "transact business or acquire, hold or dispose of property in this state," and there is no claim that the case does not come within the provisions of the statute.

One contention on the part of the defendants is that the words "shall be wholly void," in the last clause of the statute quoted, should be construed to mean simply voidable at the option of the plaintiff, and not absolutely void and a nullity. After careful consideration, this court has recently held that "where the statute provides that the act shall be void, and fixes a penalty for the perpetration of the prohibited act, the word 'void' should be interpreted as meaning void absolutely, in accordance with the technical accuracy of the word." *Land, L. & L. Co. v. McIntyre,* 100 Wis. 245, 75 N. W. 964, and cases there cited. The section in question is highly penal. "The failure to comply with any" of its "provisions" subjects the corporation, "or any agent, officer or person acting for it in this state, to a penalty of $500" for the first violation, and $1,000 for any subsequent violation. We must hold that the words, "shall be *wholly void* on its behalf and

on behalf of its assigns, but shall be enforceable against it and them," mean just what they say; and, if they are valid, they render the contract in question absolutely void and a nullity, in so far as it is sought to be enforced on behalf of the defendants by way of counterclaim in this action.

Is the section a valid law? In the leading case of *Paul v. Virginia,* 8 Wall. 168, 181, it was said by Mr. Justice FIELD, speaking for the whole court in regard to foreign corporations, that:

"Having no absolute right of recognition in other states, but depending for such recognition and enforcement of its contracts upon their assent, it follows, as a matter of course, that such assent may be granted upon such terms and conditions as those states may think proper to impose. They may exclude the foreign corporation entirely, they may restrict its business to particular localities, or they may exact such security for the performance of its contracts with their citizens, as, in their judgment, will best promote the public interest. The whole matter rests in their discretion."

This language was expressly sanctioned by the same learned court in *Ducat v. Chicago,* 10 Wall. 410; *Liverpool Ins. Co. v. Massachusetts,* 10 Wall. 566; and *Philadelphia F. Asso. v. New York,* 119 U. S. 117, 7 Sup. Ct. 108. Among the many more recent cases following in the same line are *Ashley v. Ryan,* 153 U. S. 436, 14 Sup. Ct. 865; *Hooper v. California,* 155 U. S. 648, 15 Sup. Ct. 207; *New York State v. Roberts,* 171 U. S. 658, 19 Sup. Ct. 58; *Waters-Pierce Oil Co. v. Texas,* 177 U. S. 28, 20 Sup. Ct. 518. In this last case it was held that "it is well settled that a state has the power to impose such conditions as it pleases upon foreign corporations seeking to do business within it." This court has frequently sanctioned and followed the same rule. *State ex rel. Drake v. Doyle,* 40 Wis. 197, 198; *State v. United States M. A. Asso.* 67 Wis. 624, 31 N. W. 229; *Larson v. Aultman & T. Co.* 86 Wis. 284, 56 N. W. 915; *Wyman v. Kimberly-Clark Co.* 93 Wis. 559, 67 N. W. 932.

No question of foreign or interstate commerce is here involved. We must hold that the statute in question is valid, however harsh its provisions may seem to be. The contract having been made and the business transacted by the defendants as copartners, the defendant *Miller* cannot, as an individual, take anything by the alleged counterclaim in favor of the firm.

*By the Court.*—The judgment of the circuit court is wholly reversed on the plaintiff's appeal, and the cause is remanded for a new trial. The defendants take nothing by their appeal.