THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Appellant, vs. HOST, Commissioner of Insurance, Respondent.

*December 19, 1904—May 2, 1905.*

*Life insurance: Distribution of surplus: Periods: Statutes construed: "May" and "shall:" Revocation of license: Judgment: Validity of policies.*

1. Under secs. 87 and 83 of the insurance laws of New York (ch. 118, Gen. Laws N. Y. 1868, and ch. 100, Gen. Laws N. Y. 1872) an insurance corporation of that state has authority to issue deferred-dividend policies by the terms of which accumulated surplus is not to be distributed except in periods longer than five years.
2. Sec. 1952, Stats. 1898 (providing that mutual life insurance corporations *may* distribute their surplus annually, or once in two, three, four, or five years as the directors may determine, and that in determining the amount of surplus to be distributed there *shall* be reserved an amount not less than the aggregate net value of all the outstanding policies, etc.), does not require the distribution to be made at least once in every five years. That the word "may" was intended to be permissive only is shown by the use of the mandatory word "shall" in the same section with reference to the amount to be reserved, and also by the history of the section and by the practical construction given to it by all parties concerned for more than thirty years after its enactment as sec. 14, ch. 59, Laws of 1870.

3. Where the words "may" and "shall" both occur in the same stat-
ute, it is presumed that they were used advisedly by the legis-
lature and that each was intended to be given its distinctive
meaning.
4. In an action to restrain the commissioner of insurance from re-
voking the license of a life insurance company, it should not
be adjudged that policies issued by the company were unlawful,
where the holders of such policies are not in any way parties to
the action.

APPEAL from a judgment of the circuit court for Dane
county: B. F. DUNWIDDIE, Judge. *Reversed.*

This is an action to restrain the commissioner of insur-
ance from revoking the license issued to the plaintiff to do
business in this state. The facts are mostly undisputed.
The complaint alleges, in effect, that the plaintiff was incor-
porated in 1859 under the Laws of New York of 1853, and
the amendments thereto, for the incorporation of life and
health insurance companies; that by sec. 87 of the general
insurance laws of the state of New York, first enacted as ch.
118 of the General Laws of New York for the year 1868, it
is provided that:

"Any domestic life insurance corporation which by its
charter or articles of association is restricted to making a div-
idend only once in two or more years may hereafter, notwith-
standing anything to the contrary in such charter or articles,
make and pay over dividends annually, *or at longer inter-
vals,* in the manner and proportions and among the parties
provided for in such charter or articles."

That by sec. 83 of the general insurance laws of the state
of New York, first enacted as ch. 100 of the General Laws of
1872, it was provided that:

"Any domestic life insurance corporation may ascertain
at any given time, and from time to time, the proportion of
surplus accruing to each policy from the date of the last to
the date of the next succeeding premium payment, and may
distribute the proportion found to be equitable, either in
cash, in reduction of premium or in reversionary insurance,

payable with the policy, and upon the same conditions as therein expressed at the next succeeding date of such payment, notwithstanding anything in the charter of such corporation to the contrary."

And the complaint further alleges that all of its policies issued by it since its organization and now outstanding were executed in the state of New York, and are payable at the home office of the plaintiff in the state of New York.

The complaint further alleges, in effect, that for several years prior to the commencement of this action the plaintiff had done business in this state under licenses issued by the several commissioners of insurance; that December 12, 1902, one L. A. Brunckhorst, as a citizen and resident of this state, presented to the commissioner of insurance a petition or complaint wherein he alleged, in effect, that the plaintiff was a foreign life insurance company doing business in this state on the mutual plan, being duly licensed by the insurance department; and further alleged that the plaintiff "is now violating, and has for many years knowingly and wilfully violated, the insurance statute" of this state known as sec. 1952 and the acts amendatory thereof, "to the great damage, loss, and detriment of the people of the state of Wisconsin, in that said company has failed to comply with the provisions of said sec. 1952 . . . in failing to make distribution of the surplus funds of said company among the policy-holders of said company as provided in and by said section; . . . that by reason of such violation thousands of citizens of the state of Wisconsin have been deprived of moneys justly due them by forfeitures imposed by" the plaintiff, "and are now and continue to be deprived of money justly due them from said company;" and prayed that the plaintiff be summoned to appear before the insurance commissioner to show cause why its license should not be revoked in accordance with sec. 1955 of the Statutes of 1898 and acts amendatory thereof. The complaint alleges that pending the hearing of that peti-

tion, and on March 1, 1903, the commissioner issued a license to the plaintiff for one year, similar to such former licenses held by the plaintiff; that a hearing was had upon such petition June 16, 1903, and the defendant, as such commissioner, made his decision thereon July 31, 1903, wherein, among other things, he decided as follows: "I further decide that" the plaintiff "has violated said sec. 1952, as charged" by the complainant, L. A. Brunckhorst, "by not complying with the provisions of said section. Therefore I hereby notify the *Equitable Life Assurance Society of the United States* that if a statement, signed by the proper officers of the company, that there will be a compliance with sec. 1952, *as herein decided,* be not filed with this department within the period of thirty days from the date hereof, the license of the company to transact business in this state will be revoked at the expiration of that time."

The complaint herein further alleges, in effect, that the defendant, acting or assuming to act as such commissioner,

"threatens to and will at the expiration of thirty days from July 31, 1903, revoke the license of this plaintiff to transact business in Wisconsin, unless within that period this plaintiff file with said defendant a statement in writing that it will comply with sec. 1952 as construed by said defendant (which construction said plaintiff alleges was and is erroneous), and threatens to and will thereafter revoke the license of the plaintiff to transact business in Wisconsin *unless* this plaintiff *distribute among its policy-holders,* regardless of the terms of their policies, the amount so erroneously found by the said defendant to be a surplus as aforesaid, in accordance with his said construction of said statute, and unless the plaintiff shall otherwise comply with said statute as so erroneously construed by the defendant."

The defendant's answer to the complaint herein admits that the plaintiff is, and for more than forty years past has been, a corporation organized and existing under the laws of the state of New York, engaged in the business of life insur-

ance on the mutual plan, and that for many years past it had
been duly licensed under the laws of the state of Wisconsin
to transact such business within this state; that the plaintiff
was incorporated in 1859 under the general act of the legis-
lature of the state of New York passed June 24, 1853; that
ch. 118 of the General Laws of New York for the year 1868,
sec. 87, was duly enacted and became and was and is the law
of the state of New York, as set forth in the complaint; that
ch. 100 of the General Laws of 1872, sec. 83, of the state of
New York, was enacted, became, was, and is the law of the
state of New York, as alleged in the complaint; that the
policies issued by the plaintiff since its organization and now
outstanding were all executed in the state of New York and
are payable at the home office of the plaintiff in said state.
The answer further alleges, among other things, in effect,
that the surplus funds which this defendant determined to
be in possession of the plaintiff subject to distribution un-
der sec. 1952, and which, under the defendant's decision,
*must be distributed among the policy-holders* of the plaintiff
annually or once in every two, three, four, or five years, pur-
suant to sec. 1952, was composed in large part of earnings
and accumulations derived from payments made by policy-
holders of the plaintiff under such deferred-dividend policies;
that the total amount of outstanding insurance of the plaintiff
at the date of the decision of the commissioner was in
excess of $1,300,000,000; that the total value of its assets
at said time and now does not exceed $400,000,000; that
during the last ten years the plaintiff has paid in dividends
$28,847,371.31; that such amount was paid as alleged and
shown in the complaint; that the petitioner was not a policy-
holder of the plaintiff; that the defendant, acting as such
commissioner, "had he not been enjoined by the writ issued
in this action, would have revoked the license of the plaintiff
to transact business in Wisconsin within thirty days after
July 31, 1903, if the plaintiff had not within such time filed

a statement in writing that it would comply with sec. 1952 *as construed by this defendant;* and that this defendant *intends,* unless restrained by the order of this court, *to revoke the license* of the plaintiff to transact business in Wisconsin, unless plaintiff complies with the provisions of sec. 1952, *and distributes* among its policy-holders at least once in five years the surplus earnings which have been shown to be in the plaintiff's possession; that the plaintiff·has many thousands of policy-holders within the state of Wisconsin;" that March 1, 1903, the defendant issued to the plaintiff a license to do business in Wisconsin for the ensuing year because the plaintiff had otherwise complied with the requirements of the laws of this state, and this defendant was under restraint, as mentioned; that the insurance contracts of the plaintiff issued to Wisconsin citizens now in force on December 31, 1902, amounted to $14,014,692, the annual premiums being paid thereon amounting to $428,100; that more than eighty-four per cent. of the insurance contracts and policies aforesaid now in force issued to and held by Wisconsin citizens and policy-holders are upon what is known as the ten, fifteen, and twenty year deferred-dividend plan, by which no dividends are to be paid or apportioned to, nor is any surplus divided between or among, such policies and insurance contracts until the end of the deferred-dividend period, and not then if a forfeiture is imposed upon death or the failure to pay premiums.

The issues thus joined were tried by the court, and at the close of the trial the court made findings of fact and conclusions of law, and, among other things, found, in effect: (4) That the defendant, on July 31, 1903, in a proceeding theretofore commenced and heard before him as such commissioner for the revocation of the license of the plaintiff upon the ground that the plaintiff was issuing a form of life insurance policy containing provisions contrary to the requirements of sec. 1952 of the Statutes, as such "commissioner

made a ruling in which he held that said plaintiff was issuing such policies in violation of the requirements of said section, and giving said plaintiff notice that, unless within thirty days from the date of said ruling it filed in said insurance department a statement that it would comply with said section *as interpreted by him in said ruling,* he would revoke said plaintiff's license to do business in this state." (5) That the plaintiff did not comply with said ruling and is not complying therewith, but, on the contrary, has commenced this action to restrain the commissioner from enforcing his ruling. (12) That the plaintiff has assets in the total amount of $381,226,035.53, of which $73,354,138.03 is a surplus over and above the amount of the legal reserve and the amount required by the company for the purpose of discharging all its liabilities as they may occur in the future; that the amount of such legal reserve, together with the premiums becoming due and payable upon present contracts issued, are sufficient to discharge all obligations of the plaintiff association as they mature; that the plaintiff has not made distribution of such surplus according to sec. 1952, "but has for many years violated, and does now violate, the provisions of said section by failing, neglecting, and *refusing to distribute or apportion* at least every five years the surplus profits and earnings of the plaintiff company among its policy-holders, residents of the state of Wisconsin, holding and representing policies and contracts to the amount of *twelve million dollars and upwards.*"

And as conclusions of law the court held, in effect: (1) That the issue of deferred-dividend policies by which the distribution of dividends is deferred beyond a period of five years to the citizens of this state is contrary to the first provision of sec. 1952, *and is unlawful;* (2) that unless the plaintiff signifies its consent to discontinue the issue in this state of deferred-dividend policies, the commissioner of insurance "may and should, under the requirements of secs.

1955, 1972a, and 1978 of the Statutes of 1898, revoke the plaintiff's license to do business in this state;" (3) that there has been no practical construction of sec. 1952 as permitting the issue in this state of said form of policy now binding upon the court; (4) that the defendant is entitled to judgment dissolving said preliminary injunction, dismissing this action, and for his taxable costs and disbursements; and ordered judgment to be entered accordingly. From the judgment so entered the plaintiff appeals.

For the appellant there were briefs by *Winkler, Flanders, Smith, Bottum & Vilas,* attorneys, and *Bainbridge Colby* and *Charles F. Fawsett,* of counsel, and oral argument by *F. C. Winkler, J. G. Flanders, C. F. Fawsett, Bainbridge Colby,* and *D. T. Watson.*

The *Attorney General* and *Julius E. Roehr,* of counsel, for the respondent.

The following opinion was filed February 21, 1905:

CASSODAY, C. J. The facts in this case are practically undisputed and largely stipulated. The plaintiff was incorporated in 1859, under the laws of New York then in force, as a domestic life insurance corporation. It continued to do such business under such laws and the several amendments thereto from that time down to the controversy in question, which arose about two years ago, and has also continued such business since. For more than thirty years prior to the controversy in question the plaintiff had been doing such insurance business in this state, and issuing to the citizens thereof "deferred-dividend insurance," wherein the accumulated assets or surplus was not to be distributed except in longer periods than five years. Each of such policies was executed in the state of New York and payable at the home office of the plaintiff in that state. Eleven other life insurance companies, named, each and all doing business in Wisconsin during the time mentioned, had adopted and issued similar

policies as to the periods for the distribution of such accumulated assets or surplus. The plaintiff alone has issued and has outstanding in the United States at least $1,000,000,000 in such form of insurance, of which at least $12,000,000 was so issued and is outstanding in Wisconsin. It is conceded that during each and every year of the thirty mentioned the commissioners of insurance of this state issued to the plaintiff a license to transact the business of life insurance in this state, reciting in each such license that the plaintiff had "complied with the laws of this state relative to life insurance companies," and that until the controversy in question "no formal or official objection of any kind was ever brought to the attention of the plaintiff by any insurance commissioner of the state of Wisconsin, or by any other official of said state;" and that during that period neither the right of the plaintiff nor any other company to transact such form of business was ever "challenged by or on behalf of the state of Wisconsin." The controversy in question was not instituted by any policy-holder of the plaintiff, but by an individual solely as "a citizen and resident" of this state. The substance of the complaint of such "citizen and resident" upon which the revocation of the license so issued to the plaintiff was prayed, and the hearing and decision of the commissioner thereon, are set forth in the foregoing statement. That decision of the commissioner, so made July 31, 1903, held that the issuing of such policies by the plaintiff was in violation of the statutes of this state, and that, unless the plaintiff filed a statement in his office within thirty days from the date thereof that it would comply with the statutes as interpreted by the commissioner, he would revoke the plaintiff's license to do business in this state. Before the expiration of the thirty days so fixed by the commissioner this action was commenced to restrain him from revoking the plaintiff's license, as mentioned in the statement of facts. The substance of the complaint and answer, and the findings of fact

and conclusions of law made by the trial court, and the judgment dismissing the action are sufficiently set forth in the foregoing statement.

It is claimed that the decision of the commissioner of insurance, as affirmed by the trial court, should be sustained upon either of two grounds: (1) The first ground upon which it is so claimed naturally calling for consideration is that the plaintiff is not authorized by the laws of New York to issue such "deferred-dividend insurance," wherein, by the terms of the contract, the accumulated assets or surplus was only to be distributed in longer periods than five years—usually ten, fifteen, or twenty years. True, as stated by the commissioner and found by the trial court, the provisions of the original charter of the plaintiff, issued under the laws of New York in 1859, declared, in effect, that the insurance business of the company should be "conducted upon the mutual plan;" that "within sixty days from the expiration of the first five years, . . . and within the first sixty days of every subsequent period of five years," the officers of the company should "cause a balance to be struck of the affairs of the company, which" should "exhibit its assets and liabilities," and also its "net surplus, after deducting a sufficient amount to cover all outstanding risks, and other obligations;" and that each policy-holder should "be credited with an equitable share of the said surplus;" and that "such equitable share" should "be applied to the purchase of an additional amount of insurance," or "to the purchase of an annuity," as therein provided. The trial court also found, in effect, that prior to 1868 the plaintiff, pursuant to such charter provisions and to law, did so distribute among all its dividend participating policy-holders its surplus funds; that in 1868 the plaintiff devised a form of policy, now known as "deferred-dividend policies," as already mentioned; that the plaintiff began the issue in Wisconsin of such deferred-dividend policies, wherein the apportionment of dividends was

deferred for more than five years, in 1871. But it is alleged in the complaint, and is expressly admitted in the answer, that by sec. 87 of the general insurance laws of the state of New York, first enacted as ch. 118 of the General Laws of New York for the year 1868, it was provided that:

"Any domestic life insurance corporation which by its charter or articles of association is *restricted* to making a dividend only once in two or more years may hereafter, notwithstanding anything to the contrary in such charter or articles, make and pay over dividends annually, *or at longer intervals,* in the manner and proportions and among the parties provided for in such charter or articles."

By sec. 83 of the general insurance laws of the state of New York, first enacted as ch. 100 of the General Laws of 1872, it was provided that:

"Any domestic life insurance corporation may ascertain *at any given time, or from time to time,* the proportion of surplus accruing to each policy from the date of the last to the date of the next succeeding premium payment, and *may distribute* the proportion found to be equitable either in cash, in reduction of premium or in reversionary insurance, payable with the policy, and upon the same conditions as therein expressed at the next succeeding date of such payment, notwithstanding anything in the charter of such corporation to the contrary." R. S. N. Y. (Birdseye's ed.) pp. 1849, 1852.

Those provisions of the New York statutes were all considered by the court of appeals in *Greeff v. Equitable L. A. Soc.* 160 N. Y. 19, 26, 27, 31, 54 N. E. 712. That was an action by a policy-holder to recover $7,087.38 as the alleged unpaid balance of the defendant's net surplus, to which the plaintiff claimed to be entitled under the statutes mentioned. The policy in that case was issued July 1, 1882, and payable May 2, 1897, or upon the death of the assured if it occurred before, in the sum of $20,000. June 23, 1897, the company paid to the plaintiff $23,932 as the total amount due to the plaintiff in accordance with the express terms of the contract

*as written.* In the opinion of the court it was there said that:

"The plaintiff's claim that the whole surplus should be distributed cannot be sustained if it is in conflict with the provisions of the contract between the parties, without making a new contract for them, which the court will not do. Therefore this question depends for its solution upon a proper interpretation of the provisions of the policy. The parties agreed that the plaintiff should participate in the distribution of the surplus according to the methods and principles adopted by the company. It is to be observed that the agreement was that the plaintiff should participate, not in the whole surplus, but in the distribution of the surplus, or, in other words, in the surplus which, according to the defendant's methods and principles, was to be distributed."

Thus it appears that such "deferred-dividend insurance" is not only expressly authorized by the statutes of New York in question, but enforcible by the courts of New York. As conceded by the commissioner and his counsel, "the charter of the company is the source of its very existence." Certainly, the plaintiff "derives its existence, powers, and rights solely from the laws" of New York. 13 Am. & Eng. Ency. of Law (2d ed.) 837. The courts of that state are abundantly able to enforce and administer such laws. But that fact did not prevent this state from imposing such conditions and restrictions upon corporations of other states transacting business in this state as the legislature saw fit to impose. This was forcibly declared in *Paul v. Virginia,* 8 Wall. 168, and has frequently been sanctioned by the same court since, and has repeatedly been followed by this court. *State v. U. S. Mut. Acc. Asso.* 67 Wis. 629, 630, 31 N. W. 229, and cases there cited; *Ashland L. Co. v. Detroit S. Co.* 114 Wis. 78, 89 N. W. 904, and cases there cited. There is nothing in the record indicating that such deferred insurance policies were issued in violation of any statute of New York, and hence the revocation of the license cannot be justified on that ground.

2. But the principal ground urged in support of the judgment of the trial court is that the issuance of such deferred insurance policies to citizens of this state by the plaintiff and such other companies was in violation of the statutes of this state, and particularly the section which declares that:

"Every life insurance corporation doing business in this state upon the principle of mutual insurance, or the members of which are entitled to share in the surplus funds thereof, *may* make distribution of such surplus as they *may* have accumulated annually, or once in two, three, four or five years as the directors thereof *may* from time to time determine. In determining the amount of the surplus to be distributed *there shall be reserved* an amount not less than the aggregate net value of all the outstanding policies, said value to be computed by the American experience table of mortality with interest not exceeding four and one-half per cent." Sec. 1952, Stats. 1898.

There can be no doubt that during the period mentioned the plaintiff was an "insurance corporation doing business in this state upon the principle of mutual insurance," within the meaning of that section. The charter of the plaintiff declared that such business of the company should "be conducted upon the mutual plan;" and that it was so conducted is, in effect, conceded. So the members of the plaintiff corporation, under that section of the statute, were undoubtedly "entitled to share in the surplus funds thereof" whenever the "distribution" of the same should be made. The controversy is as to whether, under that section, it was competent for the plaintiff, by contract with citizens of this state, to defer such "distribution" for a longer period than five years.

The language of the section is that such corporation *"may* make distribution of such surplus . . . annually, or once in two, three, four or five years as the directors thereof *may* from time to time determine." The word "may," in its ordinary and common use, is certainly permissive and not mandatory. But it is claimed with much plausibility that,

if the purpose of the section was to make it optional with the directors of such corporation whether such distribution should be "annually" or "from time to time," as they might "determine," then the use of the words "once in two, three, four or five years" is without significance. Such language, however, is immediately followed in the section by the statement that "in determining the amount of the *surplus* to be distributed *there shall be reserved* an amount not less than the aggregate net value of all the outstanding policies, said value to be computed" as therein stated. There can be no question but that the words "shall be reserved," as thus used, are mandatory; and, since no distribution can be made except from such "surplus funds," nor from such funds until the amount thereof so "reserved" shall at least be equal to the "aggregate net value" mentioned, it is obvious that such distribution might thereby be wholly prevented during such five years. The two parts of the section relate to the same subject, and both must be considered in construing the same. Such use of the words "may" and "shall" in the same section has been said to afford a very forcible indication of the intention of the legislature. Sutherland, Stat. Constr. § 462; 2 Lewis's Sutherland, Stat. Constr. (2d ed.) § 640. It is there said that "the use of words that are plainly compulsory in one aspect, and the use of others which literally are permissive in another, necessarily leads to an inference that the primary meaning is to be retained." Thus, in a New York case, it is said by the court and held that:

"The words 'may' and 'shall' are both used; the former to confer a privilege, the latter as a mandate. It is presumed that the attention of Congress was drawn to the distinction between the ordinary import of the two words, and that they were used with reference to that distinction, and hence that, if it had been designed to limit prosecutions to the specified courts, the same word would have been employed as in limiting a particular proceeding to a specified court." *Cooke v. State Nat. Bank,* 52 N. Y. 96, 105, 106. To the same effect:

*People ex rel. Comstock v. Syracuse,* 59 Hun, 258, 267, 12 N. Y. Supp. 890; *Reynolds v. Board of Education,* 33 App. Div. 88, 53 N. Y. Supp. 75.

So the Indiana court has said that, where "the words 'shall' and 'may' are used in different connections, it very strongly indicates that the terms were so used deliberately, and with a due sense of discrimination, ascribing to each its literal signification. Statutory provisions upon the same subject should be construed wth reference to each other and as parts of the general system of jurisprudence, with a view of promoting harmony and symmetry in such system." *Budd v. Rutherford,* 4 Ind. App. 390, 30 N. E. 1112. So Mr. Justice MITCHELL, speaking for the Minnesota court, said that:

"In the body of the act it will be observed that the legislature has in every instance used the words 'may' and 'shall' in such a manner as to clearly show an intention to give to each its common meaning. The word 'may' is always used with reference to the granting of the extension, while the word 'shall' is uniformly used with reference to the conditions on which it is to be granted, as well as the acts to be performed by different officials, including the city council, after the extension has been granted." *State ex rel. Bell v. City Council,* 65 Minn. 299, 68 N. W. 31; *Minor v. Mechanics Bank,* 1 Pet. 46, 63, 64; *Rothschild v. New York L. Ins. Co.* 97 Ill. App. 547.

These cases will again be referred to later. Certainly a construction which would make the two clauses repugnant to each other should not be indulged unless absolutely required by the context. True, there are numerous cases where the word "may" has been construed to mean "must," but, as held in cases cited by counsel for the defendant, "the word *may* means *must* or *shall* only in cases where the public rights or interests are concerned, or where the public or third persons have a claim *de jure* that the power should be exercised." *Cutler v. Howard,* 9 Wis. 309; *Market Nat. Bank v. Hogan,*

21 Wis. 318. See, also, *Stale ex rel. Burnett v. Pierpont,* 29 Wis. 608; *State ex rel. McDill v. Board of Canvassers,* 36 Wis. 498, 506; *Dutcher v. Dutcher,* 39 Wis. 666. But as said by DIXON, C. J., in the first of these cases, "when the act to be done is not clearly beneficial to the public or third persons, the exercise of the power is held to be discretionary." The ruling in that case follows what is, perhaps, the leading case in this country upon the subject—*Newburgh T. Co. v. Miller,* 5 Johns. Ch. 101, 112, 113. Chancellor KENT there reviews the English cases on the subject with his usual learning and ability, and deduces the rule as mentioned. As indicated in some of those cases, where the word "may" is used in a statute which directs the doing of a thing for the sake of justice or the public good, or imposes a duty enforcible as such, it is to be construed as being mandatory. While sanctioning the ruling in that case, it was held in a more recent case in that state that:

"When a statute declares that an individual or individuals *shall* or *may* do certain acts, or have a certain remedy, which is intended for his or their own benefit, he or they have a discretion to do the act or pursue the remedy or not." *Malcom v. Rogers,* 5 Cow. 188.

See, also, *Mayor of N. Y. v. Furze,* 3 Hill, 612; *Buffalo & B. P. R. Co. v. Comm'rs,* 10 How. Pr. 237; *People ex rel. Conway v. Livingston Co.* 6 Hun, 572; *Medbury v. Swan,* 46 N. Y. 200; *State v. Sweetsir,* 53 Me. 438; *Brokaw v. Comm'rs,* 130 Ill. 482, 22 N. E. 596; *Seiple v. Elizabeth,* 27 N. J. Law, 407.

The general rule mentioned has long been recognized by the supreme court of the United States. *Minor v. Mechanics Bank,* 1 Pet. 46, 64. In that case Mr. Justice STORY, speaking for the court, adds, what may be instructive here, as follows:

"Without question, such a construction is proper in all cases where the legislature mean to impose a positive and absolute duty, and not merely to give a discretionary power.

But no general rule can be laid down upon this subject further than that that exposition ought to be adopted in this, as in other cases, which carries into effect the true intent and object of the legislature in the enactment. The ordinary meaning of the language must be presumed to be intended unless it would manifestly defeat the object of the provisions."

In a late case construing a statute of the state of Louisiana and expressly sanctioning the language just quoted it was held that:

"The provision . . . that the surplus of the revenues of parishes and municipal corporations for any year may be applied to the payment of the indebtedness of former years is not mandatory, but only permissory, and creates no contract right in a holder of such indebtedness of former years which can be enforced by *mandamus.*" *U. S. ex rel. Siegel v. Thoman,* 156 U. S. 353, 15 Sup. Ct. 378.

Mr. Justice WHITE, writing the opinion of the court in that case, adds, by way of quotation and otherwise, that:

"It is only where it is necessary to give effect to the clear policy and intention of the legislature that such a liberty can be taken with the plain words of the statute." "In the law to be construed here it is evident that the word 'may' is used in special contradistinction to the word 'shall,' and hence there can be no reason for taking such a liberty. The legislature first imposes an imperative duty—the application of the revenue of each year to the expenses thereof—and then makes provision for the case of an excess of revenue over expenses. In the first the word 'shall' and in the latter provision the word 'may' is used, indicating command in the one and permission in the other." Pages 359, 360 (15 Sup. Ct. 380).

The facts in that case are, in some respects, similar to the facts in this case.

3. It is claimed by both parties that the history of the section in question shows the intention of the legislature in passing it. Sec. 1952, Stats. 1898. That section is the same

as sec. 14, ch. 59, Laws of 1870, and sec. 1952, R. S. 1878, except that up to the enactment of ch. 309, Laws of 1887, it also included accident insurance.    It is pointed out by the defendant that the bill for the enactment of ch. 59, Laws of 1870, was reported by a committee under instructions "to inquire what legislation" was "necessary in regard to the business of insurance in this state, in order to afford proper *protection to policy-holders,* and more systematically to establish the regulation of insurance business in this state."    It is, moreover, stated by the defendant and alleged in the answer, in effect, that prior to "1870 all life insurance companies doing business on the mutual plan in the United States had made provision for the distribution of profits or surplus among their policy-holders at periods of five years or less," or, as so alleged, in "one, two, three, four, or five years." It was expressly conceded by the defendant on the trial "that at the time of the passage of this act in 1870 the longest period for which dividends were deferred in mutual companies was five years."    It is argued by the plaintiff that this of itself shows that the evil sought to be guarded against by that enactment was not an over-accumulation of assets and a failure to distribute dividends, but the lack of protection against insolvency.    In other words, it is claimed that the object of such enactment was "to afford proper protection to policy-holders" by safeguarding the solvency of such insurance companies; that prior to that time the only requirement in that regard in this state was that such companies must have a paid-up capital of $100,000 without providing for any reserve, and requiring that an annual statement should be made to the secretary of state.    That the purpose was to safeguard the solvency of such companies is apparent from the fact that the accumulation of reserve fund mentioned in section 14 of the act of 1870 (sec. 1952) is provided for in sec. 10 of the act of 1870 (sec. 1949).    Up to the time of that

enactment the statute of Massachusetts on the subject used the
permissive word "may" in connection with the distribution of
the surplus fund, and the mandatory word "shall" in connec-
tion with such reserve fund. The same was true with the act
of March 26, 1869, of Illinois, from which our ch. 59, Laws of
1870, was largely taken, and from which the tenth and four-
teenth sections were almost literally copied. The only direct
adjudication upon the language contained in sec. 1952, Stats.
1898, which is in substance the same as sec. 14, ch. 59, Laws
of 1870, is an Illinois case. *Rothschild v. New York L. Ins.
Co.* 97 Ill. App. 547. That case is in harmony with the ad-
judications mentioned, and expressly held that sec. 14 of that
act "is not a grant of power, but is, perhaps, a limitation on
the power of such companies to distribute their surplus funds
oftener than once a year. In the absence of such a provision
the time of distribution would depend on the directors, ex-
cept so far as limited by the charter of the company or valid
by-laws." After discussing the rules of construction gen-
erally, the court used this language:

"Applying these rules to the words 'may' and 'shall' in
sec. 14, the former must be regarded as permissive and the
latter as imperative. We can conceive of no good reason,
nor are we aware of any rule of interpretation, which would
warrant the holding that the words 'may' and 'shall' are used
in the same sense in the section, and that imperative. There-
fore we cannot sustain the contention that the section requires
distribution of surplus at least once in every five years, or
that the contracts between the company and appellant, as-
suming that such contracts contain the charter provision in
regard to distribution of surplus, are in violation of sec. 14."
Page 555.

We see no escape from the conclusion thus reached. For
more than thirty years prior to the controversy in question the
language of the statute has remained substantially the same.
During that time it has seemed to be the consensus of opinion

on the part of state officials and legislators, as well as such insurance companies, that the time of distribution was permissive, but that the amount of the reserve fund was mandatory. Apparently upon the faith of such opinion the vast aggregate amount of deferred-dividend insurance policies mentioned was issued. That such was the consensus of opinion is manifest from the fact that the insurance commissioner attempted in 1901 and again in 1903 to have the section of the statute in question amended so as to make the time of such distribution mandatory instead of being permissive, as indicated. But such efforts failed.

Thus it appears that the history of the section and the practical construction given to it are in harmony with the permissive meaning of the word "may" and the mandatory meaning of the word "shall" as ordinarily understood, and we find nothing in the context of the section, nor any of the rules of law mentioned, requiring us to give to those words a different meaning. There is nothing in the record to indicate that the plaintiff has failed to comply with any provision of law of this state, much less that it has violated any law of this state, within the meaning of the statutes authorizing a revocation of such license to do business in this state. Secs. 1955, 1968, 1972a.

4. It should be observed that the trial court not only affirmed the decision of the insurance commissioner in revoking the plaintiff's license to do business in this state, but also found, as a conclusion of law, that the issue of such dividend policies by the plaintiff, in which the distribution was deferred beyond a period of five years, was "unlawful;" and judgment was entered thereon accordingly. Thus it was adjudged in this action that the numerous policies issued by the plaintiff to citizens of this state, aggregating several millions of dollars, as found by the trial court, were all *unlawful,* and that, too, without any of the holders of such policies having been made parties, or given a hearing, or having appeared in

the action.    Such gratuitous finding and adjudication must have escaped the notice of the learned trial judge.

*By the Court.*—The judgment of the circuit court is reversed, and the cause is remanded with direction to grant the relief prayed for in the complaint.

A motion for a rehearing was denied May 2, 1905.

KERWIN, J., took no part in the decision.