## AKERS *v.* KIRKE & COMPANY.

1. It was competent for the plaintiff to testify why it was that in the first instance he charged the account sued upon to the defendant's husband.
2. An agency to borrow money for the purpose of clearing off liens from defendant's property does not comprehend an agency to confer with the holder or claimant of one of the liens and make to him declarations touching the agency, the payment of the debt, the agent's hopes or arrangements as to borrowing money, or the purpose for which it was wanted, no application for any loan being made to such holder or claimant.
3. A conversation between the parties shortly before the trial, in which the defendant made certain admissions, was not rendered inadmissible as evidence by being brought about by the plaintiff through a proposition of settlement, it not appearing that the defendant's admissions were made with any view to a compromise, nor that any terms of settlement were mentioned or discussed.
4. There being evidence tending to show that the defendant's father had authority from her to borrow money for the discharge of the debt sued for in this action, his declarations to persons to whom he applied for loans, as to the purpose for which the money was wanted, were admissible in evidence, the purpose so declared being within the scope and object of the authority, so far as the debt now in controversy is concerned.
5. There being no contest as to the ownership of the premises, it was immaterial who furnished the money to pay for them.
6. Recovery may be had upon evidence that the party sought to be charged was the concealed principal of a person who acted in his own name without disclosing his agency, though this fact be not alleged in the pleadings. If the objection was a good one to the evidence, it should have been presented and insisted upon when

the evidence was offered, so that the declaration could be amended and made specific as to the mode in which the contract between the plaintiff and the defendant was created.

7. Where the verdict undoubtedly represents the natural equity and sound justice of the case, and there is enough legal evidence to support it, the admission of some illegal evidence in behalf of the prevailing party will not render a new trial indispensable. Both the trial court and the reviewing court being satisfied, the verdict must stand.

April 24, 1893. Argued at the last term.

Before Judge MARSHALL J. CLARKE. Fulton superior court. September term, 1891.

Kirke & Co. sued Mrs. Akers upon an account, and also to foreclose a lien as contractors and material men, for work done and material furnished for the repairing and building of a house belonging to her. She pleaded, not indebted, that she made no contract with plaintiffs, etc. A verdict was rendered for plaintiffs on their account; defendant's motion for a new trial was overruled, and she excepted.

The evidence for plaintiffs shows the following: The materials mentioned in the account went into the house, which belonged to Mrs. Akers. At the time plaintiffs were making the improvements they thought the house belonged to Akers. Akers came to them and got them to do the work, and they charged the account to him because they supposed he owned the house and the house was good for it. They completed the job, and have never been paid for it. Since the work was done plaintiff Kirke had a conversation with Mrs. Akers' father, Shepherd, in reference to Mrs. Akers paying the debt; this was a month or so after the lien was filed. Her father came into the store and stated that he hoped to settle the account in a very short time. He was making arrangements, Kirke thought, with Mr. Healy to borrow money, and hoped it would be all satisfactory, and in a very short time he would pay the account. Kirke did not think he stated who he was trying to bor-

row the money for, only that he wanted to pay off the debt; did not think he mentioned his daughter's name; he said he wanted it to pay plaintiffs for the work done on the house. Kirke had a conversation with Mrs. Akers in reference to that conversation with her father, and she said that her father was trying to borrow the money for her to pay off what she owed plaintiffs. When the goods were sold, Akers belonged to a firm which stood well, and plaintiffs were perfectly willing to sell goods to Akers, and never asked Akers whether he owned the lot or not, nor inquired of any person in whom was the title to the lot, supposing of course that the house would be good for the improvements. They gave the credit to Akers and the lot and house combined, supposing he owned the house and that the house was good for it. Did not see Mrs. Akers at all in the transaction. There are one or two articles in the account charged to Mrs. Akers, part of a gas-fixture, one or two of the small articles she might have purchased. The goods were not sold on the credit of Mrs. Akers, and she did not enter into the computation at all. Plaintiffs afterwards claimed the money from her because they found out she owned the lot and house. The last item of the account went on the house. The morning of the trial Mrs. Akers and her father were sitting together, and he went out, and Kirke took a seat by her and said, "in some way this case can be settled," and then the conversation with her occurred. Kirke thought if they could arrange it without going to a trial he preferred to do so; meant it should not go to trial if she could pay up and not have a trial. He did not know, of course, whether she would or not. Had no idea of compromise at all. She told him that her father had been trying to borrow the money to pay this debt, but she did not know why he did not succeed. There was no written contract to furnish the material, nor was there a contract with any-

body, except a verbal one of Akers. Akers came and made the trade to get a stove from plaintiffs, and Mrs. Akers paid for it the following June. Akers left Georgia some time in December, 1889, or January, 1890. Kirke thought he saw Mrs. Akers down at the house, and that she might have been down in the store, but was not certain that she was in the store. Scott testified that Shepherd wanted to borrow some money on the property from Healy, for Shepherd's daughter to pay certain debts with it, saying he wanted to remove the liens that were on the property; and Shepherd put into Scott's hands deeds to the lot in question, for examination. Shepherd also tried to borrow of Wellhouse money on the property, to pay off the balance due on it, and left a deed at Wellhouse's. Shepherd stated to Wellhouse that he wanted to borrow the money for his daughter. The daughter herself never applied to Wellhouse for a loan. There was evidence also that Mrs. Akers was at the house during part of the time that the work was being done, saw it done and directed some changes to be made.

For the defendant there was testimony that she was absent from Atlanta during the time the improvements were being made, and when she returned it was all complete and she directed no changes. She did not agree with anybody to make the improvements, and knew nothing about them. She did not make anybody her agent to have the improvements made. Her husband was not her agent, and she never had any conversation with him in which he said he was going to act as her agent, or anything of that kind. She had no notice of any purchases to be made, knew nothing about building houses, did not employ any workmen to assist in the work, and bought no material. First saw Kirke the morning of the trial, and did not remember ever purchasing anything from him. Did not buy the stove, did

pay for it, but never gave any promise, to pay for any other part of the debt. In the conversation with Kirke the morning of the trial, he asked her if there was any way the matter could be settled. She told him she did not know, as she knew nothing of it in any way, having been absent from the city. She could not tell anything about it; and if there had been any way, or if they had tried to adopt some means to have settled it, she told him she believed she had heard something of it, but did not know anything about it, and could not tell him anything more. She did not say anything about her father; his name was not mentioned. Her father was never appointed by her as her agent in any capacity, and she had no knowledge of any transactions he may have had. She has one or two gentlemen in Atlanta who attend to the rents of the place. Her father looks after the business sometimes. Work had just begun on the house before she went away. She did not know they were going to rebuild the house and enlarge it. She had not talked it over with her husband. Sometime afterwards, a good while, she heard him speak of it, but did not know for certain it was going to be done. Did not know they were going to improve the house; knew they had commenced it before she left, but did not know it was going to be done. Did not talk to her husband in reference to what was going to be done to the house; asked no questions as to what was going to be done; has had her deed to the land in her hands a long time, longer than six months. Does not remember when she gave it to her father, nor how long it was after the suit was brought. Her father attended to some of that business of borrowing money for her. He was in Atlanta looking after her business for her. "In this matter sometimes—I suppose so—as I was not here I don't know anything about it. I don't remember whether I turned over my deed to my father and told him to do

the best he could with it or not." Defendant is using
the property since the improvements have been put upon
it, and her husband has nothing to do with it, having
left Georgia sometime ago. "I don't know what I
gave father the deed for—I guess he—nothing. . . .
Don't know whether I let him have it to come to At-
lanta and negotiate a loan to pay off this indebtedness
on my property or not. . . Father sorter oversees
my property sometimes. Since my husband left, some
of the time father has been in charge of my affairs, and
I suppose he is here now looking after this suit. . . .
There has been several thousand dollars of improvements
put upon the house, and I have not paid one dollar for
it. I don't think there has been any paid. I am re-
ceiving the benefits and rents of those improvements
that are put on there." Shepherd testified: Akers in
a letter told him he, Akers, owed some parties for ma-
terial furnished and labor done in repairing or remodel-
ing the house, and would like for Shepherd to assist
Mrs. Akers in trying to get some money to pay off the
indebtedness, suggesting that he thought Shepherd
could get some money from Healy, Wellhouse or others,
that he thought with Shepherd's assistance he could
borrow the money. Shepherd came to Atlanta for that
purpose and saw several parties with a view of getting
the money, but was informed that the claims against
the property amounted to so much, that "we" aban-
doned the idea. Mrs. Akers did not do anything. Wit-
ness talked with her, advised with her. She did not
want to encumber the property with a mortgage, and
no agreement was ever reached from her to mortgage,
that witness knew of. They were considering the pro-
priety of the thing when witness went to try to get the
money to relieve the house of a debt which he believed
Akers owed. Witness did not recognize that Mrs.
Akers owed anything. The debts were against Akers.

Mrs. Akers never constituted witness as her agent to negotiate. They advised together in reference to borrowing this money, and witness attempted to borrow it, was attempting to borrow it upon her property; that is what they were considering; the object was to take the liens off the property. Witness does not know what facts constitute an agency. Mrs. Akers wanted the parties paid for the work done on the building, but is not herself able to do it. She owns the property, with a twenty-seven room house upon it, etc.

The motion for new trial has the following grounds:

1. Error in allowing plaintiff to testify that "We charged the account to G. W. Akers, because we supposed he owned the house and the house was good for it," over objection that "the lot was not responsible for the improvements unless the owner procured the improvements or subsequently ratified them."

2. Error in permitting plaintiff to testify, over objection: "I have had a conversation with her father, since the work was done, in reference to Mrs. Akers paying the debt. Her father, as near as I can remember, came into my store a month or two after the lien was filed, and he stated to me that he hoped to settle this account in a very short time. He was making arrangements, I think, with Mr. Healy to borrow money, and he hoped it would be all satisfactory, and in a very short time he would pay the account. He wanted it to pay us for the work done on the house." The objections were, that her father could not bind her, that the testimony was irrelevant, and that the promise, if any, on Mrs. Akers' part to pay G. W. Akers' debt, should be in writing.

3. "On cross-examination of plaintiff he testified: 'This morning Mrs. Akers and her father were sitting together, and he went out, and I went in and took a seat by her and said this: could not in some way this case

be settled? and then this other conversation occurred,' meaning her admission testified to previously by plaintiff, to wit: 'Mrs. Akers said her father was trying to borrow the money to pay the debt off.' " When plaintiff so testified, defendant moved to exclude the conversation already testified to by plaintiff and set out above, on the ground that whatever occurred or was admitted in said conversation could not be received against defendant on this trial, as the conversation was looking to a compromise.

4. The court permitted J. A. Scott to testify: "I think he [T. J. Shepherd] wanted to pay certain debts with it. He wanted to borrow it for his daughter. Mr. Shepherd stated that he wanted to remove the liens that were on the property; that was what he wanted with the money." Defendant objected that this did not bind Mrs. Akers, and that it was irrelevant.

5. The court refused to permit defendant to show who furnished the consideration for the lot sought to be subjected to the lien of plaintiffs. As plaintiffs set up that Mrs. Akers and Mr. Akers were concealing an agency, this evidence was proper.

6. Plaintiffs alleged a contract and debt of Mrs. Akers, but the evidence only tended to establish a concealed principal, which was not alleged; and the allegations of the petition and the evidence do not agree.

7. The verdict is contrary to law and evidence.

MAYSON & HILL, for plaintiff in error.

W. J. ALBERT, contra.

BLECKLEY, Chief Justice.

The head-notes, together with the official report of the facts, will render the rulings made in this case sufficiently intelligible. There can be no doubt that the verdict of the jury represents the natural equity and sound justice of the case. The legal ground on which

the verdict rests is, that Mrs. Akers was the concealed principal of her husband, and that, although the credit was originally given to the latter by Kirke & Co., this was done in ignorance of the agency and of the true ownership of the property. There was enough legal evidence that such was the real truth of the case to uphold the verdict. That some illegal evidence was admitted does not render a new trial indispensable. To every lover of justice the verdict already found is more satisfactory than would be one of an opposite nature. It is impossible not to feel that, as Mrs. Akers, not her husband, obtained the benefit, she or her property ought to answer for it rather than Kirke & Co. should lose their money. Where all the consideration of a debt reaches a wife as an accession to her separate estate, and she retains and enjoys it, only slight evidence of the husband's agency in contracting the debt is required to charge her. We have examined many adjudications upon somewhat similar cases, but it is needless to cite them, for while some of them would make for us, they are balanced by others of an opposite tendency. We prefer to rest the case on principle and its own facts. Both the trial court and the reviewing court are content with the verdict. This being so, we decline to order a new trial for slight errors immaterial to the result on the actual merits of the controversy.

*Judgment affirmed.*