Union Trust Company of Maryland and another, Plaintiffs, vs. Rodeman and others, Defendants. [Two appeals.]

*December 2, 1935—March 3, 1936.*

454

For the plaintiffs (appellants and respondents) there were briefs by *Charles H. Gorman* and *Emmet Horan, Jr.,* both of Milwaukee, and oral argument by *Mr. Gorman, Mr. Horan,* and *Mr. Robert M. Crounse* of *Stinchfield, Mackall, Crounse, McNally & Moore,* of Minneapolis, Minnesota.

For the defendant (appellant) Elsie Rodeman there was a brief by *McGovern, Curtis & Devos* of Milwaukee, and oral argument by *H. K. Curtis* and *A. L. Devos.*

For the defendants (respondents) Badger Sash & Door Company and Paul H. Kurth Plumbing Company there was a brief by *Charles J. Weaver,* attorney for the Paul H. Kurth Plumbing Company, and by *Nathan Pereles, Jr.,*

attorney for the Badger Sash & Door Company, both of Milwaukee, and oral argument by *Mr. Pereles.*

The following opinion was filed January 7, 1936:

WICKHEM, J. (1) *Upon defendant's appeal.*

The principal defense to the action of foreclosure is founded upon the conceded fact that neither the Union Trust Company of Maryland, one of the plaintiff trustees, nor the White-Price Company of Minnesota, with which defendant claims to have solely dealt, had, at the time of the transaction in question, satisfied the requirements of sec. 226.02 (2), Stats. 1925. This section reads as follows:

"(2) No corporation, incorporated or organized otherwise than under the laws of this state . . . shall transact business or acquire, hold, or dispose of property in this state until such corporation shall have caused to be filed in the office of the secretary of state a copy of its charter, articles of association or incorporation and all amendments thereto duly certified by the secretary of state of the state wherein the corporation was organized. . . . *Any foreign corporation, including any bank or trust company, may, in its corporate name, and without being licensed to do business in this state, advance and loan money therein, and take, acquire, hold and enforce notes, bonds, mortgages or trust deeds given to represent or secure money so loaned or advanced or for other lawful consideration, and all such notes, bonds, mortgages or trust deeds . . . acquired or held by any such foreign corporation shall be as valid and enforceable as though it were an individual, and such right of enforcement shall include the right to acquire the mortgaged property upon foreclosure, or in virtue of the provisions of the mortgage or trust deed, and to dispose of the same; provided, however, that any such corporation which shall hereafter transact in this state the business above provided for shall first file with the secretary of state a statement in writing by its president, secretary, treasurer or general manager that it constitutes the secretary of state its attorney for*

*the service of process as provided in paragraph (f) of subsection (3) of this section; and provided, further, that except as regards the advancing and loaning of money and the taking, acquiring, holding and enforcing of securities as above provided, nothing herein contained shall be construed as authorizing any foreign corporation to transact in this state the business of a bank or trust company, or otherwise to exempt any foreign corporation . . . from the provisions of this section or other statutes of this state. . . ."*

Since this was a loan transaction, our consideration of the questions raised properly begins with that portion of sec. 226.02 (2), Stats., which constituted the amendment of 1915. This amendment (which is italicized in the quotation from sec. 226.02 (2), *supra*) provides that a foreign corporation may loan money and acquire security for the loan, provided that any such corporation "which shall transact in this state the business above provided" shall first file with the secretary of state a statement in writing by its president, secretary, etc., that it constitutes the secretary of state its attorney for the service of process.

This amendment was construed by this court in *First State Bank v. Harrington,* 192 Wis. 293, 212 N. W. 665. In that case plaintiff, an Illinois corporation, which had not satisfied the requirements of sec. 226.02 (2), Stats., loaned money to a resident of Wisconsin, and took as security two chattel mortgages on personal property of the debtor located in Wisconsin. The loan was made in Illinois. This court held that sec. 226.02 (2) did not invalidate the notes and mortgage. It was considered by the court that two situations are covered by the amendment: (1) Where loans are made outside of this state to residents of Wisconsin; (2) where a foreign corporation comes within the state to transact the business of making loans. In the latter case, the

statute must be satisfied; in the former, no restriction whatever is placed upon the transaction. The court says:

". . . After having declared valid all loans and securities made and taken in transactions outside the state this limitation follows: 'Provided, however, that any such corporation which shall hereafter *transact in this state* the business above provided for shall first file,' etc., showing clearly that business transacted outside the state stands upon a different basis than business transacted within the state, and that it was only business transacted within the state that came within the filing requirement. . . ."

This case is the proper starting point in disposing of this appeal. In the case of *Wisconsin Trust Co. v. Munday,* 168 Wis. 31, 168 N. W. 393, 169 N. W. 612, relied on by appellant, the court dealt with the prohibition against holding property in this state. The case of *Catlin & Powell Co. v. Schuppert,* 130 Wis. 642, 110 N. W. 818, was decided in 1907 and before this amendment. *Street Railway Adv. Co. v. Lavo Co.* 184 Wis. 395, 198 N. W. 595, deals with a contract for the sale of advertising in streetcars. Upon some such basis all of the earlier cases may be disposed of, leaving only the question whether this was a loan made outside the state by a foreign corporation to a Wisconsin resident, or a transaction in this state of "the business above provided for." This requires some consideration of the facts.

The defendant Elsie Rodeman was the owner of the premises in question and had commenced the construction of a building thereon. For the purposes of these operations, she had secured a loan from a building and loan association. It becoming apparent that the original loan would not be sufficient, Mrs. Rodeman, through her husband, began to seek another loan. At the suggestion of one of the materialmen, the latter applied to William L. Davidson & Company, a corporation engaged in the brokerage of real estate and

the negotiation of loans. The Davidson Company had theretofore had some correspondence with the White-Price Company, as a result of which there was an understanding that it was to transmit applications for loans to the White-Price Company, suggest appraisers and a resident trustee, and otherwise facilitate the loaning of money in Wisconsin by the latter company.

On December 3, 1925, Elsie Rodeman applied to the White-Price Company for a first mortgage loan of $16,000, and this application was forwarded to Minneapolis, the office of the company. At this time the White-Price Company had no offices in the state of Wisconsin and had not satisfied the requirements of sec. 226.02 (2), Stats. It appears that the application of Mrs. Rodeman was submitted by the White-Price Company to the Mortgage Security Corporation of America to which it looked for funds to cover the loan, or to which it bore somewhat the same relation that the Davidson Company bore to it. Some objection was made by the Mortgage Security Corporation of America to the loan due to credit reports with respect to defendant's husband. January 4, 1926, White-Price Company wired the Mortgage Security Corporation of America that it could close the Rodeman loan only on the basis of $14,000. On January 17th, the Mortgage Security Corporation of America wired the White-Price Company that the mortgage was approved for $14,000, subject to occupancy, satisfactory income, and expense statements, and assignment of rents to the trustees. First series notes and second series notes, a copy of the trust deed, and an "estoppel certificate," certifying to the fact that no defenses existed in favor of the makers of the note and trust deed, were received, fully executed, by the White-Price Company from the William L. Davidson & Company with a letter of transmittal dated January 22, 1926.

The first series notes were all dated January 1st, signed by Elsie and Charles A. Rodeman, and payable to bearer at the office of the Union Trust Company at Maryland. The second series were signed only by Elsie Rodeman, but were made payable in the same manner. A deed of trust securing the notes was dated January 1, 1926, and contained a provision that the mortgagor should pay monthly the sum of $146.50 to the Union Trust Company of Maryland, to be applied upon interest coupons and principal.

It is obvious from the record that the trustees were selected by the Mortgage Security Corporation of America. The first series notes were deposited with the Union Trust Company of Maryland before maturity and were held under a trust indenture to secure certain trust certificates executed by the Mortgage Security Corporation of America and guaranteed by the National Surety Company. The second series notes were delivered to the National Surety Company to secure their guarantee of the trust certificates.

The sole question is whether the foregoing constituted a transaction in Wisconsin of the business of making a loan. The matter is not free from difficulty, but it is our conclusion that it did not.

The application for the loan was signed by the Rodemans, and the proceedings leading up to the loan were initiated by them. Upon receipt of this application by the White-Price Company, certain conditions were made having to do with the amount of the loan and the assignment of rentals. These conditions were imposed by the Mortgage Security Corporation of America, which was advancing the money. Upon satisfaction of the conditions, the note and mortgage were transmitted to the White-Price Company, and the money was sent from Minneapolis to the defendants. The notes were payable to the Union Trust Company of Maryland. All of the essential business and all of the decisions

on the side of the lenders, whoever they were, were made in Minneapolis or Virginia. The loan was ultimately accepted in Minneapolis and evidenced by instruments calling for payment at places outside the state of Wisconsin.

This transaction cannot be held to constitute the loaning of money in Wisconsin any more than did the transaction dealt with in the case of *First State Bank v. Harrington, supra*. Had the borrower in the *Harrington Case* called the plaintiff bank on the phone and requested a loan, mailed its notes and mortgage, and received a check for the amount of the loan in the mail, the result would not have been changed. The mere fact that these steps took place by correspondence is equally immaterial. The only factor that creates some doubt is the fact that the White-Price Company had in this state a representative, whose apparent function was to solicit applications and transmit them to Minneapolis for action.

It is our conclusion that the limited scope of the authority of William L. Davidson & Company makes it impossible to conclude, in the face of the other facts, that the loan was made in Wisconsin through the agency of this company. The authority of William L. Davidson & Company was merely to solicit and to transmit applications. Having done this, the balance of its duties were those of a mere messenger, with no discretion to propose or accept any item of the negotiation. The designation of such an agent a representative within the state does not domesticate the loan in such a way as to bring into operation the provisions of sec. 226.02 (2), Stats. The activities of William L. Davidson & Company fall within the class of those described in *Ford, Bacon & Davis, Inc., v. Terminal Warehouse Co.* 207 Wis. 467, 240 N. W. 796, as not invalidating a contract made without the state. See also *Bradt v. Beloit Dairy Co.* 201 Wis. 319, 230 N. W. 135; *American Timber Holding Co. v. Christensen,*

206 Wis. 25, 238 N. W. 897; *United States G. Co. v. Gleason,* 135 Wis. 539, 116 N. W. 238.

In this view of the case, the estoppel certificate becomes immaterial. This was an instrument executed by the Rodemans, certifying to the fact that there were no existing defenses to the notes and trust deed, and acknowledging receipt of the consideration. If, as contended by defendant, this case were to depend upon the fact that the preliminary agreement to lend created a personal liability on the part of Mortgage Security Corporation of America or White-Price Company, the estoppel certificate would appear to be fatal to defendant's contentions, because to the extent that the violation in this case depends upon the existence of a personal liability of some sort on the part of the foreign corporation, the contract is voidable and not completely void. See *Allen v. Fulton,* 167 Wis. 352, 167 N. W. 429; *Cox v. Hanson,* 200 Wis. 341, 228 N. W. 510; *American S. M. Co. v. Jaworski,* 179 Wis. 634, 192 N. W. 50. Thus, even if the analysis in the case of *Catlin & Powell Co., supra,* be treated as applicable here, it would avail the defendant nothing in view of the execution of this certificate.

With respect to the Union Trust Company of Maryland, it is the contention of defendant that this company is not qualified to act as trustee and that, where a contract is made between two persons, jointly, and a third person, if the contract is void as to one of the joint contractors, it is void *in toto.* Reliance is had on four Wisconsin cases.

In the first, *Payne v. Volkman,* 183 Wis. 412, 198 N. W. 438, plaintiffs entered into an agreement with defendants for the sale by plaintiffs of defendants' property. The contract was a joint contract. One of the plaintiffs was not a licensed real-estate broker. It was held that the contract was wholly void.

In *Ashland Lumber Co. v. Detroit Salt Co.* 114 Wis. 66, 89 N. W. 904, an action was brought by plaintiff, a Wisconsin corporation, against two foreign corporations and an individual to recover a balance due plaintiff from defendants under a contract pertaining to manufacture of lumber in Wisconsin. The three defendants interposed a counterclaim. It appeared that the foreign corporations had not complied with the statute, and that, as to them, the contract was void. It was held that, being void as to two of three joint contractors, it was completely and wholly void.

*De Wit v. Lander,* 72 Wis. 120, 39 N. W. 349, was an action by plaintiff on a contract made by him on behalf of himself and another person as his partner. This court declined a recovery after a plea in abatement had been interposed on the ground that there was a variance, plaintiff suing solely and proving a joint liability.

*Hickey v. Sutton,* 191 Wis. 313, 210 N. W. 704, was an action by two persons as copartners to recover the reasonable value of services as architects. One of the plaintiffs was a registered architect; the other was not. It was held that, since the work was done by the plaintiffs jointly, the failure of one to comply with the statute would bar recovery by either.

A completely different situation is presented in this case. The Union Trust Company of Maryland is not the lender; it is merely a legal person chosen to act as trustee. The loan itself did not constitute a violation of the statute, for reasons heretofore stated. This being true, the objection, if valid at all, merely goes to the qualifications of one of the trustees to act. Such a situation is contemplated and provided for by the trust deed, which in that event vests in the remaining trustee all of the rights, powers, and authority originally vested in both. The remaining trustee, the National Bank

of Commerce of Milwaukee, is concededly qualified to act as trustee, and we conclude that there is no validity to defendant's contention.

In view of the foregoing conclusions, it is unnecessary to determine whether the Mortgage Security Corporation of America, Union Trust Company of Maryland, or White-Price Company is entitled to the status of an innocent purchaser for value.

The next contention is made with reference to the second series of notes. The undisputed testimony shows that the items going to make up the consideration for this note were: National Surety Company, guarantee fee; Union Trust Company of Maryland, trustee's fee; White-Price Company, commission; Stein Brothers & Boyce, commission; Mortgage Security Corporation of America, guarantee fee and profit. It is contended that, since these expenses were not separately specified and did not include a commission to the White-Price Company or the commission to Stein Brothers & Boyce for the sale of certificates issued on the security of the notes, they did not amount to a consideration, because they in no manner benefited the defendant, and in effect amounted to the imposition of an additional and usurious rate of interest.

The contention that the loan could not be made in consideration of a promise to pay commission and expenses of the sort here involved, and that it was not so made, impresses us as obviously untenable. While it is assigned as error that the trial court found that this series of notes were not usurious, the point is not argued in plaintiffs' brief and will not be labored here. Suffice it to say that, assuming these contracts to be governed by Wisconsin law, there was no attempt to satisfy sec. 115.08, Stats., which provides:

"Whenever any person shall apply to any court in this state to be relieved in case of a usurious contract or security, or when any person shall set up the plea of usury in any action

instituted against him, such person to be entitled to such relief or the benefit of such plea shall prove a tender of the principal sum of money or thing loaned to the party entitled to receive the same."

Since there is no contention that the notes are void by operation of the law of any other state, we shall not pursue the matter further.

It is next contended that at any event the defendant should have recovery upon her cross complaint for damages arising out of the fact that less than $14,000 was actually paid over to her, causing damages which have heretofore been referred to. The court found, and the evidence sustains the findings, that the lender of the money paid to defendant's account $13,976.34, which was the balance of the $14,000 after allowing for certain proper credits and charges. We conclude that this assignment is without merit.

It is our conclusion that the judgment of foreclosure was properly entered.

*(2) Upon plaintiffs' appeal.*

Plaintiffs' appeal raises questions of priority as between the trust deed, heretofore referred to, and the mechanic's lien claims of the Badger Sash & Door Company and the Paul H. Kurth Plumbing Company. Questions are also raised as to the validity of the Badger lien. The first question raised is applicable to both the Badger and Kurth claims; the second only to the Badger claim. Plaintiffs claim that, having paid the building and loan mortgage, they are entitled, under the doctrine of *Bank of Baraboo v. Prothero,* 215 Wis. 552, 255 N. W. 126, to be subrogated to the priorities peculiar to building and loan mortgages under sec. 215.15, Stats. That section provides:

"215.15 *Mortgages.* . . . Such [building and loan] mortgage shall have priority over all liens upon the mortgaged premises and the buildings and improvements thereon

which shall be filed subsequent to the recording of such mortgage. . . ."

The lien of the building and loan mortgage was superior to that of either of the mechanic's lien claims here involved. It is contended that, since under the *Prothero Case, supra,* the loan to discharge the building and loan association mortgage was made upon the understanding that plaintiffs were to have a first mortgage, they are entitled to subrogation, at least to the extent to which the new loan discharged that of the building and loan association. The lien claimants contend that the building and loan association note and mortgage was not merely nonnegotiable but unassignable so long as the building and loan association continued a going concern, and that, being unassignable, there can be no subrogation.

It would seem to be true that building and loan association notes and mortgages are unassignable in such a way as to affect or impair the relations between the member-mortgagor and the association. Thus, it is to be doubted whether plaintiffs could have purchased the mortgage from the building and loan association while Mrs. Rodeman remained a member of the association and retained her right to have instalments paid on stock subscriptions applied to the mortgage. The conclusion that plaintiffs could not discharge the mortgage at the request of the member-mortgagor in such a way as to get subrogation is more doubtful. Since the discharge was at the member's request and contemplated a voluntary termination of her membership, it could hardly be said to impair her relations with the association. However, we do not find it necessary to determine the validity of this contention in view of our conclusion that for other reasons plaintiffs are not entitled to subrogation.

In the *Prothero Case, supra,* it was said :

"A review of these cases indicates that a volunteer is not entitled to be subrogated, even though his advance discharges

a mortgage and was intended to be applied to that purpose, and that the right of a party to subrogation, by reason of advances made to a debtor, depends upon, (1) his being secondarily liable; or (2) the necessity for acting to protect his own interests; or (3) an agreement that he is to have security. . . ."

It is to be noted that these comments were solely directed to the question whether plaintiffs were volunteers. They do not state a complete and exclusive test to determine rights of subrogation. Had the contention been made here that the lender was a volunteer, the doctrine of the *Prothero Case, supra,* would dispose of that contention favorably to plaintiffs. That, however, is the extent of the holding. The doctrine of subrogation is equitable in character, and the relief will be denied where the granting of it would accomplish an uncontemplated and inequitable result. Upon the ground that such would be the consequences, the trial court correctly held that plaintiffs were not entitled to subrogation to the lien of the building and loan mortgage.

At the time when application for a loan was made to the White-Price Company, the building and loan association had advanced for construction purposes the sum of $7,599.72. The loan of $14,000 was not merely to retire the mortgage of the building and loan association but to pay off existing mechanics' liens and to discharge other claims for construction costs. The project of procuring a new loan to take the place of that evidenced by the building and loan note and mortgage was suggested by a representative of the Badger Sash & Door Company, and the intended purpose of using the surplus to discharge existing lien claims repels the inference that there was any understanding or expectation that plaintiffs were to be subrogated to the existing lien claims, because it was not anticipated that the liens would survive the disbursement of the money loaned.

Under these circumstances, the trial court correctly concluded that it would be inequitable to subrogate plaintiffs to the lien of the existing mortgage.

In *Wentworth v. Tubbs,* 53 Minn. 388, 55 N. W. 543, it is said that the right of subrogation—

". . . Can only apply where the payment operates as a purchase or equitable assignment, and not an extinguishment of the claim. It only applies in favor of one who has bought the debt, either expressly or by paying it under circumstances which render the payment equivalent to a purchase. Whether the payment amounts to a purchase or an extinguishment is really a *question of intention,* either express or presumed from the relation of the party to the debt or other circumstances under which the payment was made. . . ."

The remainder of the assignments of error relate solely to the Badger claim.

It is first contended that the court erred in permitting the Badger Company to amend its lien claim, to change the description of the property involved, and to include more property than was involved in the original lien claim. The real estate involved is described as lots 15, 16, and 17, of block 10, Bonny Park subdivision. The improvements consisted of a duplex dwelling house and a separate three-car garage over which there is a third apartment. The lots in question front on Sherman boulevard. Lot 17 is a corner lot, and the side of this lot abuts on Auer avenue. The house and garage are so located as to be situated partly on each lot. The claim for lien erroneously included only lots 15 and 16 and omitted lot 17, upon which the south eight feet of the duplex house rests. There is no contention that the error in omitting lot 17 operated to mislead anyone.

Sec. 289.01, Stats., provides:

". . . Every person who . . . furnishes any materials . . . : (a) For or in or about the erection, . . . of any dwelling house; . . . shall have a lien thereupon and upon the

interest of the owner of any such building, . . . or of the interest of the person causing . . . such materials, . . . to be furnished in and to the land upon which the same is situated, . . . or if within the limits of a city . . . upon the piece or parcel of land designed for use in connection with such house . . . not exceeding one acre."

Sec. 289.08, Stats., provides with respects to claims for lien:

". . . It shall be signed by the claimant or by his attorney, and need not be verified, and may be amended, in case of action brought, by order of the court as pleadings may be."

The trial court's power to permit amendment of the complaint and claim for lien is discretionary, and we discover no abuse of discretion. Had the claim described property wholly separate and distinct from that upon which the improvements were made, there might be merit to plaintiffs' contention, but the trial court here could properly treat the claim as containing a merely erroneous or incomplete description of the property and order the amendment. It was a point upon which there was no issue of fact, and we discover no prejudice resulting either from the misdescription or the order allowing the amendment. See *Willamette Steam Mills Co. v. Kremer*, 94 Cal. 205, 29 Pac. 633.

The next contention is that the Badger Company was a subcontractor; that it recognized this by giving to Elsie Rodeman the usual subcontractor's notice; that it billed its goods to C. A. Rodeman as general contractor; that it failed to file its claim for lien within sixty days as required by sec. 289.02 (2), Stats.

We deem it unnecessary to add to what is already a very extended opinion a detailed review of the facts. It is our conclusion that the court's findings to the effect that C. A. Rodeman acted as agent for the defendant Elsie Rodeman in the construction operations is amply supported by the evi-

dence. The fact that at the commencement of the work the Badger Company supposed that Rodeman occupied the position of an ordinary contractor is immaterial. When it subsequently discovered that he had been acting as agent of Mrs. Rodeman with full power to bind her, it had the right to hold her as principal. The general rule with respect to the liability of an undisclosed principal is thus stated in Restatement, Agency, § 186:

"An undisclosed principal is bound by contracts and conveyances made on his account by an agent acting within his authority. . . ."

It is elementary that the fact that a third person had theretofore dealt with the agent as principal does not affect the liability of the principal upon discovery. Even after discovery of the identity of the principal, the fact that such a third party looks only to the agent for payment or performance does not affect the principal's liability. The rule in this respect is thus stated in Restatement, Agency, § 209:

"An undisclosed principal is not discharged from liability upon a contract made for him by an agent by the fact that, after the discovery of his existence or identity, the other party looks only to the agent for payment or performance."

The rule establishing the liability of the undisclosed principal when discovered involves the corollary that a third person to whom the liability runs has the same lien rights against the principal that he would have had against the agent had the agent been in fact a principal. This is established by the cases. *Akers v. Kirke,* 91 Ga. 590, 18 S. E. 366; *Inter-State Bldg. & Loan Asso. v. Ayers,* 71 Ill. App. 529, 549, affirmed in 177 Ill. 9, 52 N. E. 342; *H. C. Behrens Lumber Co. v. Lager,* 26 S. D. 160, 128 N. W. 698. See also *Marshall v. Hall* (Mo. App.), 200 S. W. 770.

It is concluded that the Badger Company had six months, and not merely sixty days within which to file their claim.

Plaintiffs' final contention is that, assuming the Badger Company to have been a principal contractor, it failed to file its claim for lien within six months from the date of the last charge for furnishing the materials in question. The trial court found that the last date upon which the Badger Company furnished materials, and that of the last charge therefor, was February 10, 1926. The claim for lien was filed May 28, 1926. The sole question is whether the finding is supported by the evidence. An extensive discussion of the testimony and exhibits bearing upon that question would be unprofitable and will not be attempted. It suffices to state that we have carefully examined the record and are satisfied that the finding is not against the great weight or clear preponderance of the evidence.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on March 3, 1936.