# 66800. SAWNEE ELECTRIC MEMBERSHIP CORPORATION v. THOMPSON.

QUILLIAN, Presiding Judge.

This is an appeal from a verdict in favor of plaintiff-appellee Thompson in a tort action to recover damages for personal injury from defendant-appellant Sawnee Electric Membership Corporation (Sawnee).

The evidence authorized the jury to find as follows: Thompson was a repairman for Southern Bell (Bell), who was checking out a telephone problem. In doing so he climbed a pole which carried only telephone lines, having no electric lines connected to it as some poles do. At the top of the pole were two metal terminal boxes, one on each side of the pole. When Thompson got to the terminal boxes, his chest was against one terminal box. He reached around the pole to fasten his safety belt and his arms came in contact with the terminal box on the other side of the pole. An electrical charge then ran through his body from one of the metal terminal boxes to the other, shocking him and causing him to fall from the pole to the ground resulting in an injury to his ankle. The electric current which shocked Thompson came from the telephone ground connection at a nearby house where the buried telephone cable going to the house was grounded to Sawnee's electric power ground rod for the house. Such common grounds are a usual and recommended practice, and serve to protect the systems from lightning strikes. They normally carry very little or no voltage in them, and are not dangerous to humans. However, Sawnee's ground connection at the house had the potential for relatively high voltages of up to 90 volts because of a defective connector between the main and feed line neutral wires supplying electricity to the house. This prevented the electric power in the hot lines going into the house from following its normal path back into the neutral power lines, and caused the return current to seek a ground elsewhere. This resulted in Sawnee's grounding rod at the house to be energized with substantial voltages of electricity which in turn followed the telephone ground connection back to the pole where Thompson was working and placing a charge on the terminal box on the pole to which the telephone line was connected. Because Bell had failed to make a ground connection, or bond, between the terminal boxes on the pole, when Thompson touched both the boxes with his body the Sawnee electricity coming from the connection at the house flowed through his body, causing a shock which resulted in his fall and injury.

As Bell, Thompson's employer, was concededly negligent in failing to bond the two terminal boxes on the pole together, the case

was submitted to the jury on the alleged concurrent negligence of Sawnee causing Bell's telephone line to be carrying a dangerous electrical charge. *Held:*

1. On the second day of trial at the end of the noon recess in the court room and in the presence of counsel a juror asked the bailiff that if she were hoeing in her garden and struck an underground cable with the hoe, would she get a shock from it. The bailiff went to appellee's counsel and repeated the inquiry to the counsel. Counsel told the bailiff that there probably would not be an electric cable buried in her garden, that if there was one it would be insulated, and that if a hoe struck the cable it could possibly break through the cable. The bailiff relayed this to the juror. The bailiff then spoke to Sawnee's general manager, who was sitting at the defense table, who told him that she was not apt to get a shock due to the wooden handle of the hoe. When the recess ended, appellant immediately moved for a mistrial on the ground that it could not get a fair trial from the juror as well as the other jurors because the juror's question and the answer given by appellee's counsel prejudiced them against the appellant. The trial court questioned the jurors, other than the juror involved, and ascertained that even though some of them had heard parts of the exchange, none were influenced in any way against either party and that each juror could give a just and fair verdict. The motion for mistrial was denied, and the following day during the course of the trial and before deliberations had commenced, the court simply removed the juror who had asked the question and replaced her with an alternate, without informing the other jurors why. After the verdict the trial judge questioned the jurors again as to whether anything involved in the conversation between the bailiff, counsel and the removed juror, or the removal of the juror, had influenced them in any way in reaching a verdict. The court ascertained that each juror was not so influenced. A motion for a new trial on these grounds was also denied. Appellant enumerates these adverse rulings as error.

Although the communication between the juror and appellee's counsel via the bailiff did not pertain to the issues in the case or necessarily involve a matter which could have affected a fair trial, the trial court removed the juror and ascertained that the remaining jurors had not been influenced. This action was sufficient to dispel any possible prejudice to appellant.

" 'Ordinarily motions for mistrial because of improper conduct of jurors or parties are addressed to the sound discretion of the trial judge.' [Cit.]

"Unless there is an abuse of discretion concerning the trial court's ruling on alleged improper juror conduct, the appellate court

will not upset the trial judge's determination. [Cit.]" *Hart v. State,* 157 Ga. App. 716 (1), 717 (278 SE2d 419).

There was no abuse of discretion in this case.

2. Appellant asserts that the trial court erred in failing to charge on accident.

The evidence is undisputed that the cause of the charge at the house ground rod, which resulted in Thompson's injury, was a defective connection between Sawnee's main and feeder neutral lines supplying electricity to the house.

Nine days before the injury, one of Sawnee's servicemen answered a complaint of surging electrical power made by the residents of the house. His supervisor had informed him the complaint concerned voltage at the ground. No one was home when he arrived and checks at the ground rod showed only a very low voltage. As the norm is no voltage at the ground, any voltage usually indicates a problem. No problem was found at the nearby pole to which the house was connected. The electric meter showed that very little power was being used in the house at the time. If the residents had been home the serviceman would have had them switch various appliances on while he checked the voltage at the ground connection. The serviceman left a note that he had found nothing and reported to Sawnee that he had found nothing wrong. The normal procedure for checking for voltage at the ground is to have the power consumption in a residence varied by switching appliances on and off while the voltage at the ground is checked.

After Thompson was injured and on the same day, a Bell employee found that the telephone cable on the pole was energized with electricity from 40 to 90 volts through the cable's ground connection to Sawnee's ground connection at the house. He disconnected Bell's ground from Sawnee's ground. Two days later, an electrician hired by the house residents to find out what was causing their power surges also found voltages of 30 to 80 volts at Sawnee's ground connection, the voltages varying as house appliances were switched on and off. He advised the householders that the problem was in Sawnee's system. Later the same day, three Sawnee servicemen came to the house and found voltages at the ground connector varying from 10 to 90 volts. They began checking poles back toward the main line and found on the sixth pole from the house where the feeder line was connected to the main line, that the connector between the neutral lines was defective. They corrected this by adding another connection, leaving the defective connector in place. This cured the condition as there was no longer any voltage measurable at the house ground connection. The bad connector was apparently eventually replaced but not preserved and there was no

evidence of why the connector malfunctioned. Expert testimony was that such connectors could fail for several reasons, some of which may be caused by the forces of nature, such as corrosion, improper installation, vandalism, vibration caused by wind, or lightning strikes.

" 'There is generally no liability for an unavoidable accident, which is defined as one which under all the circumstances could not have been prevented by the exercise of reasonable care.' [Cit.] 'In its proper use the term "accident" excludes negligence; that is, an accident is an event which occurs without fault, carelessness, or want of proper circumspection of the person affected, or which could not have been avoided by the use of that kind and degree of care necessary to the exigency and in the circumstances in which he was placed.' [Cits.]" *Ware v. Alston,* 112 Ga. App. 627, 631 (2) (145 SE2d 721). " "The principle of law relating to the theory of accident can only apply when under some theory of the case the injury is the result of the negligence of neither of the parties, but is a mere casualty due to the negligence of no one.' [Cit.]" *Atlanta Coca-Cola Bottling v. Jones,* 135 Ga. App. 362, 366 (218 SE2d 36).

In *Cruse v. Taylor,* 89 Ga. App. 611 (1) (80 SE2d 704), we said that the weight of authority was that where the owner of a motor vehicle attempts to avoid liability for a collision with evidence that there was a defect in the vehicle's brakes, it was the defendant's burden to establish that he used due care in having the brakes inspected and repaired and that the defect existed without any fault on his part at the time of the collision. Georgia law was found to be in accord "on the question of negligence as it relates not only to failure to repair after actual knowledge, but failure to inspect in such manner as to uncover a defect which an ordinarily careful inspection would disclose. [Cits.]" Id. at 616.

Analogizing the foregoing to the instant case, since there was no dispute that Sawnee's defective connector was a concurrent cause of Thompson's injury, it was Sawnee's burden to establish that the defect was without any fault on its part. The evidence showed that nine days before the injury Sawnee had notice in the form of a complaint from the residents of the house that their electric power was surging, an indication of a defect in the system. When Sawnee's serviceman responded to the complaint, because no one was home, he did not perform the usual procedures of checking the ground when varying amounts of electricity were being used in the house, and reported finding no problem although he found some voltage at the ground which usually indicates a problem. In addition, Sawnee had no record that the pole where the defect was found had ever been inspected since it was installed, although Sawnee had a pole

inspection program.

From this evidence the jury could find that Sawnee was negligent in failing to discover the defect either through prior knowledge that there was a defect some place or through routine inspection of its lines. That the defect could have been created due to one of several circumstances, some of which may have been caused by the forces of nature, does not raise the issue of accident when the evidence shows that the defect was in existence for some time prior to the injury and that Sawnee had some notice of it.

Sawnee argues that since the connector could have been damaged by an act of God, such as lightning, this was a circumstance beyond its control which entitled it to a charge on accident. This argument is based on mere conjecture as there is no evidence of why the connector failed. Moreover, an accident hardly can be said to have occurred which caused the injury and would entitle Sawnee to a charge thereon if the connector was damaged by a force of nature sometime previous to the injury and Sawnee had some notice of the defect well before the injury and did not use due diligence to locate and correct it.

"There was no evidence from which the jury could have found that the (injury) was an unavoidable accident. Somebody must have been at fault, and the question for the jury to determine was, who was guilty of negligence; and they should have been permitted to go directly into that question, without having their attention distracted by the consideration of the impossible theory that [the injury to plaintiff] was the result of an accident." *Atlantic C. L. R. Co. v. Jones,* 132 Ga. 189 (5), 196 (63 SE 834).

As the evidence in the instant case clearly shows that the injury was due to someone's negligence and not to an unavoidable accident, a charge on accident was not warranted. *Compher v. Ga. Waste Systems,* 155 Ga. App. 819 (4) (273 SE2d 200); *Cohran v. Douglasville &c. Products,* 153 Ga. App. 8 (1) (264 SE2d 507).

*Judgment affirmed. Sognier and Pope, JJ., concur.*

DECIDED SEPTEMBER 22, 1983 —
REHEARING DENIED OCTOBER 19, 1983 —

*William D. Temple,* for appellant.

*R. Douglas Lackey, Harold D. Corlew, Zachariah A. Rice, Jr.,* for appellee.