A94A1519. VICKERY INSURANCE AGENCY, INC.
v. CHAMBERS.
(449 SE2d 885)

McMURRAY, Presiding Judge.

Plaintiff Vickery Insurance Agency, Inc. brought this breach of contract action against defendant Marsha S. Chambers d/b/a Auto Motion, alleging that it had renewed a garage liability insurance policy "at the request of the defendant." The complaint further alleged that the renewal premium quoted by plaintiff and "agreed to by the defendant was $13,225.68." Plaintiff applied a $2,500 credit balance owed defendant to the down payment and notified plaintiff that an additional payment of approximately $700 was necessary. However, "defendant failed and refused to pay the premiums as agreed upon. . . ." The insurer issued a policy effective September 26, 1992, but cancelled the same effective March 3, 1993, for the stated reason: "ENDORSEMENTS NOT SIGNED AND RETURNED." Plaintiff demanded "$2,880.20 for premiums not paid by the defendant and, in addition, lost $580.00 in commission. . . ." Plaintiff also sought attorney fees, claiming defendant had acted in bad faith and had been stubbornly litigious. Defendant denied the material allegations, claiming that no agreement to renew "[ever] existed as the parties never had a meeting of the minds[,]" and counterclaimed for her deposit "in the amount of $2,700.00. . . ."

At a jury trial, the evidence showed that defendant's business is an "auto shuttle service delivering cars from dealerships to the auction and back." J. Charles Vickery, plaintiff's president and "CEO," related conversations he had held with defendant's husband, Henry R. Chambers, to establish the formation of an agreement to renew the existing insurance for Marsha S. Chambers' business. According to J. Charles Vickery, "Mr. Chambers contacted [him] around September

of 1990 and asked that [he] come to see him [Henry R. Chambers] about writing an insurance policy for the business that they were opening up." J. Charles Vickery met the Chamberses at their home. "[Marsha S. Chambers] was in our conversations when we talked about the coverages . . . [but it was Henry R. Chambers who] handled most of the conversations. . . ." When asked whether he was ever told by Mrs. Chambers that he could deal with her husband in the business, J. Charles Vickery replied: "Well, I never really talked to her anymore that I can remember. Over the next two years I dealt exclusively with him." Henry R. Chambers agreed that "[he] talked to Mr. Vickery many times, okay, and it was on different things. You know, claims may have been one of them. I did try to help my wife in her business." In early September 1992, J. Charles Vickery quoted Henry R. Chambers an annual premium "in the neighborhood of thirty-eight thousand dollars ($38,000)[,]" to renew existing coverage. Henry R. Chambers "told him [Mr. Vickery] she'd be out of business; she couldn't do that. . . . It was not acceptable at all, but [he would] have to talk to her about it." J. Charles Vickery and Henry R. Chambers discussed alternative coverages, including a suggestion by the insurer that the Chamberses could change "to a named driver basis and select permanent drivers to drive year round." The annual premium for ten permanent drivers would be $13,225.60. "Mr. Chambers told [Mr. Vickery] that whatever [Mr. Vickery] did, do not let me [Mr. Chambers] go a day without insurance. And we agreed on the thirteen thousand, two twenty five, sixty ($13,225.60) for ten operators." Sometime in November 1992, "Mr. Chambers provided [Mr. Vickery] with ten operators that he'd use on a full time basis." J. Charles Vickery turned this list over to Strickland General Agency and a policy was issued in mid-December 1992.

On December 23, 1992, Mrs. Chambers came to J. Charles Vickery's office intending "to sign a cancellation request to cancel the policy." She informed Mr. Vickery that "Mr. Chambers was going to purchase insurance from another agency[. In reply, Mr. Vickery] informed [Mrs. Chambers] that if they had not paid somebody else money already, that they didn't have any coverage with this other company that he had said that they were buying insurance from." Mrs. Chambers spoke with her husband using Mr. Vickery's telephone and left his office without signing any request for cancellation.

Evidence in opposition showed that Mrs. Chambers "own[ed] the business. [She ran] the business, and it was up to [her] to take care of the business, not [her] husband." She had a checking account for her business and did "the book work[; . . .] the paperwork[; she wrote] the checks, and [she made] the final decisions about the business. . . ." The two policies plaintiff had previously obtained specified only Marsha Chambers as the named insured. Payments on these policies were

made by Mrs. Chambers from the account of her trade name. She never signed the endorsement to the policy identifying the ten covered drivers as specified in the list Henry R. Chambers submitted to plaintiff. Nevertheless, she conceded that her husband generally "assists [her] in getting business at the auction when he's out there[,]" and that specifically, "[h]e made some calls to Mr. Vickery."

At the close of the evidence, the trial court directed a verdict in favor of defendant, concluding that there was no evidence of a meeting of the minds between plaintiff and defendant. Plaintiff appeals from the final judgment entered pursuant to that directed verdict. *Held*:

It is undisputed that no direct negotiations between J. Charles Vickery and Marsha S. Chambers ever took place. It is further undisputed that Mrs. Chambers never signed any endorsement specifying the ten permanent drivers, as required by the insurer. Plaintiff nevertheless contends the trial court erred in directing the verdict, arguing that J. Charles Vickery's discussions with Henry R. Chambers resulted in an agreement which is binding on Mrs. Chambers, by which plaintiff was to obtain insurance coverage for Mrs. Chambers' business Auto Motion. A directed verdict is proper only "[i]f there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict[.]" OCGA § 9-11-50 (a).

There is no contention that Henry R. Chambers' alleged direction to J. Charles Vickery that "whatever [Mr. Vickery] did, not to let me [Mr. Chambers] go a day without insurance . . ." resulted in an express contract between Mr. Vickery and Mr. Chambers. Perforce, plaintiff relies on a theory of agency to bind Mrs. Chambers, the sole defendant, for the actions of her husband.

"The principal shall be bound by all the acts of his agent within the scope of his authority; if the agent shall exceed his authority, the principal may not ratify in part and repudiate in part; he shall adopt either the whole or none." OCGA § 10-6-51. "The [husband] is competent to represent the wife as her agent, and this agency, like any other, if not actually created beforehand, may be manifested by ratification." *Schofield v. Jones*, 85 Ga. 816, 819 (1), 820 (11 SE 1032). " 'Where a wife permits her husband to manage and control her property or allows him so to deal with it as to induce others to believe that it is his property or that he is acting as her authorized agent, such facts are sufficient to establish the agency in favor of [third] persons who deal with him in such belief, where she knows that her husband is so managing and controlling her property and makes no objection thereto.' *Aronoff v. Woodard*, 47 Ga. App. 725 (5) (171 SE 404)." *Brogdon v. Hallman*, 119 Ga. App. 464, 465 (2) (167 SE2d 673). "While proof of the relationship of husband and wife, and that work

was done [or services performed which benefited a business] belonging to the wife, without more, is not sufficient evidence to establish the fact that she is [the] principal and the husband merely her agent, so as to render her liable for contracts made by him with third persons (*Porter v. Terrell*, 2 Ga. App. 269 [(58 SE 493)]), yet only slight evidence of the husband's agency is required under the law to charge the wife with being the principal (*Pinkston v. Cedar Hill Nursery & Orchard Co.*, 123 Ga. 302 (51 SE 387); *Akers v. Kirke*, 91 Ga. 590 (18 SE 366))[.]" *Gibbs v. Carolina Portland Cement Co.*, 50 Ga. App. 229, 230 (2f) (177 SE 760).

In the case sub judice, the two-year course of conduct whereby Mr. Chambers dealt with J. Charles Vickery over insurance matters for Marsha S. Chambers d/b/a Auto Motion, coupled with Mrs. Chambers' admitted knowledge that her husband was contacting the insurance agent on her behalf, is at least slight evidence of the husband's agency. *Gibbs v. Carolina Portland Cement Co.*, 50 Ga. App. 229, 230 (2f), 231, supra. In reliance upon his conversation with Mr. Chambers, J. Charles Vickery extended credit of approximately $2,880 in the form of premiums he paid on behalf of defendant pursuant to her husband's instructions: "whatever [you do], do not let me go a day without insurance." The evidence was sufficient to authorize a finding that plaintiff reasonably relied on Mr. Chambers' apparent authority to act on his wife's behalf so as to render defendant liable for contracts made by him with third persons. *Gibbs v. Carolina Portland Cement Co.*, 50 Ga. App. 229, 230 (2f), 231, supra. See generally *Home Materials v. Auto Owners Ins. Co.*, 250 Ga. 599, 601 (2) (300 SE2d 139). The evidence did not demand a verdict that the husband was not the agent for the defendant in negotiating and authorizing insurance coverage for her business. Consequently, the trial court erred in directing the verdict for defendant.

*Judgment reversed. Pope, C. J., and Smith, J., concur.*

DECIDED OCTOBER 25, 1994.

*Harrison & Harrison, Stephen P. Harrison,* for appellant.
*William H. Turner, Jr.,* for appellee.