A97A1321, A97A1401. HUDSON et al. v. SANTANGELO;
and vice versa.
(492 SE2d 673)

ANDREWS, Chief Judge.

In Case No. A97A1321, Hudson and Marshall IV, co-executors for the estate of Asa Marshall III, appeal from the judgment entered on the jury's verdict finding Marshall III (hereinafter Marshall) liable for damages suffered by Santangelo when he fell through a

deck railing at Marshall's home. Santangelo cross appeals in Case No. A97A1401.

## Case No. A97A1321

1. The first enumeration is that the trial court erred in denying Marshall's motions for directed verdict and judgment notwithstanding the verdict.

In deciding whether the court should have granted a motion for j.n.o.v., "[t]he primary question for determination is whether the evidence introduced, with all reasonable deductions . . . demanded a verdict for the defendant, as the standards for granting a motion for judgment n.o.v. are the same as those governing direction of a verdict. The motion for judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment. Where there is conflicting evidence, or there is insufficient evidence to make a 'one-way' verdict proper, judgment n.o.v. should not be awarded. In considering the motion, the court must view the evidence in the light most favorable to the party who secured the jury verdict. And this approach governs the actions of appellate courts as well as trial courts." (Citations and punctuation omitted.) *Famiglietti v. Brevard Medical Investors,* 197 Ga. App. 164 (1) (397 SE2d 720) (1990). Accordingly, the evidence at trial, viewed in the light most favorable to the jury's verdict, was as follows.[1]

In 1985, Marshall had overseen the construction of a new home for him and his wife. The framing carpentry work on the house was done by Crowe, a carpenter for 35 years, pursuant to plans prepared by an architect. After the framing was complete, Marshall used three subcontractors to finish the house, Bryant for sheetrock, Blair for aluminum siding, and Daniel for finish carpentry.

The house was titled in Marshall's name only and Mrs. Marshall[2] did not participate in the oversight of the construction. The house included a narrow wooden deck with a railing running along the rear of the upstairs bedroom. The deck also covered a screened porch, where the deck widened.

Daniel, who worked for the school system as a cabinet maker, had been doing trim carpentry for over 15 years. He was hired by Marshall to do the interior woodwork and the exterior railings,

---

[1] We have not considered the affidavit of a juror which was submitted with the motion for j.n.o.v. in an attempt to impeach the jury's verdict. *Consolidated American Ins. v. Spears,* 218 Ga. App. 478, 480 (1) (462 SE2d 160) (1995).

[2] Mrs. Marshall was named as a defendant along with Mr. Marshall, who died before trial and for whom the co-executors were substituted. During trial, a dismissal with prejudice of the action against Mrs. Marshall was filed by Santangelo.

including that on the upstairs deck. He designed and built a sample 36-inch high railing, which complied with the building code as Daniel understood it, and submitted it to Marshall for his approval of the design. Daniel also picked the material for the railing, western red cedar.

The rail was designed as a "functional" railing whose purpose was "[s]afety, primarily," since Mrs. Marshall was expecting the couple's first child. Daniels testified that the railing "should withstand normal use, which would be people walking by, leaning on it, or perhaps even sitting on it." The four-by-four inch posts were placed seven or eight feet apart, affixed to structural members of the house. The balusters were affixed to a one-by-two inch strip of wood with eight penny galvanized nails and the strip then affixed to the two-by-four inch top and bottom rails by screws. The completed section of the railing would then be affixed to the posts by "toenailing," or driving in from the top, bottom and side at least three to four 16 penny hot dipped galvanized nails. The railing, along with other exterior wood trim, was originally painted and had been repainted in 1988 and 1991. Building inspectors checked on the house's construction as it was built and it passed inspection.

Because of storm damage to some of the siding in the spring of 1991, Marshall contacted Blair, who had installed the siding, and retained him to make needed repairs.

Santangelo had been working for Blair Siding as an installer since 1984. Generally, he subcontracted jobs from Blair. Because he and his fiance, Stowe, were moving to South Carolina shortly and subcontracting jobs took two to three weeks, in May 1991, Santangelo was working for Blair as an employee, doing repair work and odd jobs. On May 15, Santangelo met Blair at the shop at 8:00 a.m. and they proceeded to the Marshalls to do the needed repairs. Blackshear, a friend of Santangelo who was working for him as his assistant, accompanied them. Santangelo was familiar with the property since he had previously worked there, finishing up the siding on the house and installing the siding on the outbuilding.

Earlier, Blair had gone out to the property and walked it with Marshall to see what needed to be done. Marshall mentioned several specific items, including the outbuilding siding and a leaking gutter running along the edge of the deck. In addition, Blair put on the work order which he issued to Santangelo some other small repairs which were not mentioned by Marshall but which Blair had noticed. On May 15, Blair took Santangelo around the property and showed him the jobs to be done, including the repair of the gutter on the back of the deck.

Marshall was out of town on May 15 and Mrs. Marshall left shortly after the men arrived to begin work.

Santangelo and Blackshear proceeded to repair siding on the side of the screened porch and the outbuilding. Blair had to return to the shop and left the two men working.

They had placed a ladder against the deck near the screened porch and had climbed over the railing several times during their work. As Santangelo was working on damaged siding on the deck, Blackshear came up the ladder to ask him the location of the needed gutter repair. According to Santangelo, he merely put his hand on the rail after he had "walked over to the railing, looked over and said, 'Put the screw right over . . .' and that's all, that was it. The railing dropped. It didn't . . . we didn't have any weight going forward because the railing dropped straight down and flipped right over." Blackshear testified that Santangelo was standing beside him, leaning slightly forward and pointing to the gutter when he fell off the deck and was seriously injured.

Before the fall, Santangelo and Blackshear had not noticed any loose or rotten looking railing. In fact, Santangelo testified that the posts of the railing were "solid as a rock." Marshall had not been on the deck since its original completion, but he and Mrs. Marshall periodically looked at the deck and railing from their bedroom adjacent to it and noticed nothing wrong with it. Sanders, the Marshalls' housekeeper, regularly washed windows from and swept off the deck, pushing the debris under the railing onto the ground. The railing appeared fine to her before the fall.

After the fall, Blackshear returned to the house to get their tools and he looked at the railing section which had fallen and described the ends of the railing where it had broken away as "darkish black" and said a piece of nail in the railing had corroded.

Mrs. Marshall examined the railing after visiting Santangelo in the hospital and did not see any rotten areas. Marshall, upon returning from out of town, also inspected the fallen railing and found it basically intact and said it looked like it had "pulled loose from the posts that were holding it, torn out." Sanders also looked at the rail after the fall and stated it was in one piece and did not look rotten. Two weeks after the fall, Daniel examined the railing at Marshall's request, finding it in one piece on the ground with several nails in it, looking as if it had pulled loose. He did not find any indications of rot.

At trial, Santangelo called Bayless, who owned an Archadeck franchise which designed and built decks. Although Bayless considered himself an expert on decks and railings, he was never tendered to the court and the trial court never ruled on his qualifications to give expert testimony, as was required. *Newberry v. D. R. Horton, Inc.*, 215 Ga. App. 858 (1) (452 SE2d 560) (1994).

Considering his testimony as an ordinary witness, Bayless

stated he had not seen the actual railing, but had read Daniel's deposition and examined photos of the house taken after the railing had fallen. He disagreed with the use of nails instead of screws to attach the railing to the posts, although he offered no testimony concerning the standard in the industry or code requirements. Crowe, the framing carpenter, stated that use of 16 penny nails as fasteners was the standard practice in the carpentry industry and that, when he was called by Marshall to repair the railing, he used such nails. When he examined the fallen rail, he found it intact, with only the top two-by-four rail cracked on a corner where it hit the ground. He did not see any rot. He replaced the upper and lower two-by-fours and used the same pickets, attaching the railing to the original posts.

2. The pretrial order stated Santangelo's contention that "[t]he deck and the hand railing affixed to it were negligently constructed and maintained. . . . Plaintiff contends that the injuries and damages from which he suffers are a direct result of and proximately caused by the negligence of Asa Marshall III . . . in failing to keep the premises reasonably safe by permitting a dangerous condition to exist of which [Marshall] had actual or constructive knowledge and in failing to warn plaintiff of the unsafe condition of the hand rail on the deck. Further, Mr. Marshall served as building contractor, and therefore, is liable for the negligence in the design, installation and construction of the deck and rail."

The basis for Marshall's motion for directed verdict was that no showing had been made of Marshall's knowledge of any defect in the rail, as required for a cause of action under OCGA § 51-3-1, which provides that an owner or occupier is liable to invitees for "failure to exercise ordinary care in keeping the premises . . . safe." The basis for the owner's liability is the owner's superior knowledge of the danger or defect. *Armenise v. Adventist Health System &c.,* 219 Ga. App. 591, 592 (466 SE2d 58) (1995); *Stouffer Corp. v. Henkel,* 170 Ga. App. 383 (1) (317 SE2d 222) (1984).

(a) The only evidence put forward by Santangelo concerning Marshall's actual knowledge of problems with the railing was a statement made by Mrs. Marshall while she was visiting Santangelo in the hospital. Stowe, who was present during the visit, testified that Mrs. Marshall said that "they knew that the railing was bad and that they should have already had it fixed, it should have been torn down." Santangelo recalled Mrs. Marshall saying the railing was "an accident waiting to happen. We should have replaced it years ago."

Although Mrs. Marshall denied making any such statement, we assume for the purpose of this discussion that she did. Santangelo contends that this admission of Mrs. Marshall is binding on Marshall because, as his wife, she was his agent. While an agent may bind her principal, there must first be proof of the agency relationship. Being

husband and wife will not, alone, show such agency. *Vickery Ins. v. Chambers*, 215 Ga. App. 48, 50 (449 SE2d 885) (1994); see *Slaughter v. Slaughter*, 122 Ga. App. 374, 376 (1) (177 SE2d 119) (1970). Also, the statement itself, standing alone, is insufficient to prove agency, *Weiner Brothers Co. v. Tucker*, 139 Ga. 596 (1) (77 SE 811) (1913); *Wofford Oil v. Story*, 52 Ga. App. 496, 499 (1-3) (183 SE 840) (1936).

Here, both Marshall and Mrs. Marshall testified that he took care of the original construction and upkeep of the premises, while she took care of the interior of the home. The evidence does not indicate that Marshall authorized Mrs. Marshall to make any statements regarding the construction or upkeep of the exterior of the house. Absent Mrs. Marshall's statement, there was no evidence that Marshall had actual knowledge of any problem with the railing.

(b) Apparently in an attempt to show constructive knowledge of the defect, see *Armenise*, supra at 593, Santangelo contended below that, since Marshall served as his own general contractor, he was conclusively presumed to be aware of the defective construction of the railing.

First, although Santangelo relies on Bayless' testimony to show defects in the construction, as pointed out earlier, Bayless did not testify as an expert. In order to show negligent construction, " 'it is essential to present competent evidence as to the acceptability of specific professional conduct. [Cit.] Our law requires building contractors to exercise that degree of care and skill as is ordinarily employed by other contractors under similar conditions and like circumstances. [Cit.] *Further, the standard of care must be established through expert testimony. Newberry*[, supra].' " (Emphasis supplied.) *Rentz v. Brown*, 219 Ga. App. 187, 188 (464 SE2d 617) (1995). Here, as in *Rentz*, in addition to being a non-expert, the witness presented by plaintiffs merely stated what he might have done differently in constructing the railing, but did not show the applicable standard of care in the industry or why, as constructed, the railing did not comply with that standard. See also *Bilt Rite &c. v. Gardner*, 221 Ga. App. 817 (472 SE2d 709) (1996); *McCurley v. Ludwig*, 215 Ga. App. 798 (1) (452 SE2d 554) (1994).

(c) Santangelo and Blackshear, along with Marshall's witnesses, all testified that, by looking at the railing, they were unable to detect any defect in it.

Even assuming that there was some rotting on the ends of the railing which was noticeable as it lay on the ground after it fell, Santangelo made no showing that such a condition had existed for a sufficient period of time so that Marshall should have discovered and removed the hazard by exercising ordinary care to inspect it. *Armenise*, supra at 593; *Nelson v. Polk County &c.*, 216 Ga. App. 756, 759 (1) (456 SE2d 93) (1995).

3. Further, there is no evidence indicating that Blair was acting in any capacity other than as an independent contractor in making the repairs to the siding and gutter. Legally, of course, if Blair had been an employee of Marshall while making the repairs, Marshall would have been the statutory employer of Santangelo and immune to tort liability pursuant to OCGA § 34-9-11.[3] *Green v. Moreland*, 200 Ga. App. 167 (1) (407 SE2d 119) (1991).

"An [independent] contractor is expected to determine for himself whether his place of employment is safe or unsafe, and ordinarily may not recover against the owner for injuries sustained in the performance of the contract. [Cits.]" *Amear v. Hall*, 164 Ga. App. 163, 167 (2) (296 SE2d 611) (1982); *Green*, supra.

Santangelo therefore had the duty to inspect the deck and railing area in carrying out the work and cannot impose on Marshall liability for the alleged defect which he also failed to notice.

We conclude that Marshall was entitled to a j.n.o.v. and the trial court is directed to enter it upon remand.

4. This holding makes it unnecessary to consider the remaining enumerations of error in Case No. A97A1321.

Also, it renders moot those raised in Case No. A97A1401. Two of those enumerations deal with alleged errors in the jury charge. The remaining two are that the court erred in not allowing Santangelo to introduce alleged impeaching evidence of Blair and in allowing Blair to testify concerning earlier reckless acts of Santangelo.

Since we have determined as a matter of law that a verdict was demanded for Marshall, viewing all evidence in Santangelo's favor, these matters are moot.

*Judgment reversed and remanded with direction in Case No. A97A1321. Appeal dismissed as moot in Case No. A97A1401. Birdsong, P. J., and Eldridge, J., concur.*

DECIDED SEPTEMBER 8, 1997 —
RECONSIDERATION DISMISSED OCTOBER 10, 1997 — ▮▮▮▮▮▮▮

*Miller & Towson, Wallace Miller III, James V. Towson*, for appellants.

*Reynolds & McArthur, W. Carl Reynolds, Katherine L. McArthur, Bradley J. Survant, Charles M. Cork III*, for appellee.

---

[3] It is not disputed that Santangelo was awarded workers' compensation benefits as a Blair employee.