## A07A1463. SCHUESSLER v. BENNETT.
## A07A1464. CITY OF JACKSON et al. v. BENNETT.
### (652 SE2d 884)

MIKELL, Judge.

We granted the application of Kim Schuessler, the City of Jackson (the "City"), its Mayor, members of the City Council, and Jackson Electric Department (the "Department") for interlocutory appeal from an order denying their respective motions for summary judgment. In these consolidated actions brought by Johnny Bennett for injuries he suffered when electricity from an exposed electrical wire arced causing him to fall from the ladder he was using while painting the exterior of Schuessler's home, Bennett alleged that the electrical lines running to Schuessler's home, which were owned and maintained by the City, were uninsulated and in disrepair. For the reasons that follow, we reverse the denial of summary judgment to Schuessler, but affirm as to the City defendants.

> To prevail at summary judgment . . . , the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial. . . . If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue.[1]

"We review de novo a trial court's grant or denial of summary judgment."[2] Viewed in favor of Bennett, the record shows that Schuessler hired Bennett's employer, Frederick Wilson Painting Contractors, to paint her home in Jackson. On the evening of July 16, 2003, Bennett was painting while standing on an aluminum ladder when electricity from an exposed electrical wire one foot away "arced" him, causing him to fall 24 feet to the ground. Bennett sustained severe

---

[1] (Citations omitted; emphasis in original.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[2] (Punctuation and footnote omitted.) *Dozier Crane & Machinery v. Gibson*, 284 Ga. App. 496, 497 (644 SE2d 333) (2007).

internal injuries and paralysis that rendered him permanently disabled, largely bedridden, wheelchair bound, and diminished his cognitive functioning. At his deposition, Bennett testified that he noticed that the wires were frayed and uninsulated; that his boss, Frederick Wilson, had told him the wires were frayed and had admonished him to be careful;[3] that he was concerned about the condition of the wires, but not concerned about getting shocked; that he did not know frayed wires could be dangerous; that he felt it was safe to paint around the wires; that he took no precautions before starting to paint near the wires; and that he had never "seen wires arc before." When counsel asked Bennett if Schuessler had said anything to him about a frayed wire, the following colloquy took place:

> Q: Did Ms. Schuessler at any time prior to you getting hurt say anything about a frayed wire or a defective electrical wire up there?
> A: She said be careful.
> Q: She said be careful prior to you getting hurt, Ms. Schuessler did?
> A: She just said to be careful.
> Q: I'm sorry?
> A: She said be careful.
> Q: Okay. Was she talking about being careful in general, or did she mention the wiring in particular?
> A: The wire.
> Q: The wiring?
> A: (Witness nods head)
> Q: Okay. Was this the day of the accident or some other day prior to the accident?
> A: The wire.
> Q: But did she mention the wiring the day of the accident or a day or two prior to the accident?
> A: The wire.
> Q: Do you understand my question?
> A: Yeah.
> Q: Okay. We're talking about the wiring; right?
> A: Yeah.
> Q: And we're talking about Ms. Schuessler talking about the wiring; right?

---

[3] Frederick Wilson contradicted Bennett's testimony, claiming that he never warned Bennett about the frayed wires and that he did not know they were uncovered until after Bennett's accident. When asked if he and Bennett had discussed the wires or if he had warned Bennett to be careful around the electrical wiring, Wilson responded, "No. I mean, we'd been doing it for years. We know, you know."

A: Yeah.
Q: When did she do it?
A: When did she do what?
Q: When did she talk about the wiring with you?
A: We're talking about the one wire.
Q: Okay. The wire. When did she talk about the wire with you?
A: When I was going to paint.
Q: Was it that day when you went up the ladder, or was it before then?
A: That day.

Bennett's testimony continued as follows:

Q: You said that Ms. Schuessler before you got hurt told you to be careful; right?
A: (Witness nods head)
Q: And when she told you to be careful, you all had been talking about the wire; is that right?
A: Yeah.
Q: Did she tell you why you ought to be careful in reference to this wire?
A: Yes.
Q: She did?
A: (Witness nods head)
Q: What did she tell you?
A: To be careful.

Chris Mercer, the Department's superintendent, testified that the Department is responsible for running the electrical line from the power line at the road to the electrical service connection located where the "weatherhead" attaches to the house, and for ensuring the insulation of that connection, using either a plastic cover or electrical tape. Mercer explained that the "weatherhead" is attached to a pipe which runs down to the meter box. The Department does not have a policy for inspecting the connection at the "weatherhead" or the insulation at that connection; rather, it waits for a homeowner or building owner to report a problem. Mercer did not know when the electrical line to Schuessler's home had been installed, and he could not say if the line and/or insulation at the weatherhead had ever been inspected. Mercer acknowledged that the City does not keep records of inspections. The day after the accident a crew from the Department came to Schuessler's home, noticed that the insulation cover for the weatherhead was missing, replaced it with a new one, wrapped the

wires, and turned off the power. The crew did not find evidence of a cover or other insulation material in the area.

Jon Beasley, the City's expert witness, testified that the National Electric Safety Code states that wiring should be inspected "at such intervals as experience has shown to be necessary" but does not specify a particular time frame for inspection, and that electrical utilities have a duty to conduct periodic inspections. Beasley further opined that the electrical wires connecting to Schuessler's residence did not need to be insulated because they were attached at a point greater than 12.5 feet from the ground. He explained that the "service attachment" or "drip-loop," i.e., the point at which the electrical service connects to Schuessler's home, was covered by an Anderson cover which had become partially exposed as a result of "a squirrel or squirrels eating a portion of the . . . cover" and that Bennett or his equipment came in contact with the "drip-loop" which created an electrical flash. Beasley stated that it was impossible to determine how long the wires at Schuessler's home had been exposed; they could have been exposed for several weeks, years, or decades, or could have become exposed minutes before Bennett ascended his ladder.

In his complaint, Bennett alleged that Schuessler was negligent in failing to inspect and maintain her property and that the City defendants were negligent in failing to inspect and maintain the electrical wiring within its service area.[4] The defendants moved for summary judgment. Finding that issues of material fact remained, the trial court denied defendants' motions. In Case No. A07A1463, Schuessler appeals the trial court's denial of her motion for summary judgment, and in Case No. A07A1464, the City defendants appeal the denial of their motion for summary judgment.

### Case No. A07A1463

1. Relying on Bennett's status as an independent contractor, Schuessler first contends that the trial court erred in denying her motion for summary judgment because Bennett was responsible for determining whether his place of employment was safe.

OCGA § 51-3-1 provides that "[w]here an owner or occupier of land, by express or implied invitation, induces or leads others to come upon his premises for any lawful purpose, he is liable in damages to such persons for injuries caused by his failure to exercise ordinary

---

[4] Bennett also sued his employer, Frederick Wilson, and obtained a default judgment against him.

care in keeping the premises and approaches safe." The ground for an owner's liability is his or her superior knowledge of the danger or defect.[5]

> However, a landowner is not an insurer of an invitee's safety. The invitee must also exercise ordinary care for his own safety and must by the same degree of care avoid the effect of the owner or occupier's negligence when it becomes apparent to him, or in the exercise of ordinary care should have learned of it. But, an invitee is not obliged to inspect the premises to discover latent defects nor even to observe patent defects. [Moreover,] [a]n individual contractor is expected to determine for himself whether his place of employment is safe or unsafe, and ordinarily may not recover against the owner for injuries sustained in the performance of the contract.[6]

Bennett contends that a material issue of fact remains as to whether Schuessler had knowledge of the dangerous condition of the wires. According to Bennett, Schuessler told him that she had hired an electrician to look at "her wires" before his accident, but he could not remember when this conversation took place.[7] Schuessler also told him to be careful around the wires. Timothy Wilson, Bennett's co-worker, testified that Schuessler told him that she had tried to have the power cut off because "it was close to the house" but that the Department "was swamped with so much work at that time that they couldn't get out there." Timothy Wilson and Bennett did not have time to wait for the Department to disconnect the power because they had other jobs. Timothy Wilson also testified that he understood the dangers of working around electrical wires; that he and Bennett had discussed how they were going to paint safely around the wires and where "to set up a ladder on this side of the wires"; and that he did not perceive this particular situation as unsafe. But, Timothy Wilson did not pay attention to the condition of the wires until after the accident when he and his father, Frederick Wilson, inspected the area.

---

[5] See *Hudson v. Santangelo*, 228 Ga. App. 768, 772 (2) (492 SE2d 673) (1997).

[6] (Citations omitted.) *Amear v. Hall*, 164 Ga. App. 163, 167 (2) (296 SE2d 611) (1982). See also *Herrin v. Peeches Neighborhood Grill & Bar*, 235 Ga. App. 528, 532 (1) (509 SE2d 103) (1998); *Hudson*, supra at 774 (3). See generally *Whirlpool Corp. v. Hurlbut*, 166 Ga. App. 95, 97-100 (2)-(4) (303 SE2d 284) (1983) (contractor who used gasoline to remove kitchen floor adhesive and was injured when fumes allegedly ignited stove's pilot light and caused explosion could not recover against homeowner).

[7] It is clear from reading Bennett's deposition that he has serious problems with concentration and recall, and that he may have taken medication.

Schuessler testified that she did not notice that the wires were frayed before July 16, 2003. Bryan Folsum averred that he was a meter reader for the City from February 22, 2001, to July 23, 2004; that he read the meter at Schuessler's home each month; and that he never noticed any dangerous wiring conditions at the home.

Bennett's mother testified that electricity scared Bennett and that he knew what he was doing since he had been doing this sort of work for almost 30 years. She explained that Bennett's father used to do electrical work and that Bennett did not like working around electricity.

In this case, there is some evidence that Schuessler was aware of a problem with the wiring. She called an electrician sometime before Bennett's fall and she admonished him to be careful around the wires. Nonetheless, Bennett cannot show that Schuessler's knowledge was superior to his own. Bennett admitted that he noticed the frayed wires before he started painting that day and that they concerned him. He also admitted that Frederick Wilson warned him about the condition of the wires and that both Frederick Wilson and Schuessler admonished him to be careful about the wires. The record further reveals that Bennett and Timothy Wilson had discussed how best to manage working around the wires. "The record unequivocally belies any assertion that [Schuessler] had greater understanding than [Bennett] regarding the potential hazards of the task undertaken."[8] Accordingly, the trial court erred in denying Schuessler's motion for summary judgment.

2. In light of our holding in Division 1, Schuessler's remaining enumerations are moot.

### Case No. A07A1464

3. The City defendants contend in their sole enumeration of error that the trial court erred in denying their motion for summary judgment because there is no evidence they had actual or constructive knowledge of a defect in the wiring at Schuessler's home. Bennett claims that the Department's failure to inspect its electrical lines for at least 15 years prior to his accident amounts to constructive notice. Bennett further points out that the Department had actual notice that the lines needed to be disconnected.

In support of their argument, the City defendants rely on *Crider v. City of Atlanta*[9] and *Carter v. Ga. Power Co.*[10] Both *Crider* and

---

[8] *Whirlpool Corp.*, supra at 99 (2).
[9] 184 Ga. App. 389 (361 SE2d 520) (1987).
[10] 204 Ga. App. 77 (418 SE2d 379) (1992).

*Carter* concern a municipality's duty to maintain public roads free from defects, as codified by OCGA § 32-4-93 (a).[11] More apposite in this case is the standard of care enunciated by this Court in *Collins v. Altamaha Elec. Membership Corp.*,[12] which provides that "[a] power company is charged with the duty of exercising ordinary care in the construction and maintenance of its wires, poles, transformers and equipment."[13] Except in plain, palpable, and undisputed cases, questions of negligence and diligence, especially those involving whether the defendant exercised ordinary care, are properly left to a jury.[14]

Having reviewed the record in this case, we find that there are legitimate questions of fact regarding whether the Department failed to exercise ordinary care in inspecting and maintaining the service line to Schuessler's home. Beasley, the City defendants' expert, testified that electrical utilities have a duty to conduct periodic inspections. According to Mercer, the Department's superintendent, there is no way to determine whether or when the lines connecting to Schuessler's home had ever been inspected. From this evidence a jury could conclude that the Department was negligent in failing to discover the defect in the service wire through periodic inspection of its lines.[15]

In addition, even if we apply the standard discussed in *Crider* and *Carter* — and promoted by the City defendants — questions of fact remain regarding whether the Department was contacted and asked to disconnect the lines prior to Bennett's accident and whether the Department's failure to maintain an inspection procedure amounted to constructive knowledge of the defect. The City defendants contend, however, that there is no jury question as to constructive notice because there is no evidence as to the duration of the alleged defect. "The length of time a defect must exist in order for an inference of

---

[11] *Carter*, supra at 77 (1); *Crider*, supra at 389 (1).

[12] 151 Ga. App. 491 (260 SE2d 540) (1979).

[13] Id. at 491-492 (1) (A). Accord *Williams v. Mitchell County Elec. Membership Corp.*, 255 Ga. App. 668, 670 (1) (566 SE2d 356) (2002). See also *Ga. Power Co. v. Kinard*, 47 Ga. App. 483, 484 (1) (170 SE 688) (1933).

[14] See *Mulligan v. Blackwood*, 115 Ga. App. 618, 620 (2) (155 SE2d 680) (1967). See also *Sugrue v. Flint Elec. Membership Corp.*, 155 Ga. App. 481, 483 (1) (270 SE2d 921) (1980) (physical precedent only) (whether electric utility's delay in cutting off power to transformer after notification of fire aggravated plaintiff's damages was for jury).

[15] See, e.g., *Sedlmeyr v. City of Fitzgerald*, 140 Ga. 614 (79 SE 469) (1913) (negligence cause of action stated where ordinary inspection by city would have disclosed defective condition of wires which resulted in fatal electrocution of plaintiff's son); *Sawnee Elec. Membership Corp. v. Thompson*, 168 Ga. App. 511, 514 (309 SE2d 809) (1983) (unavoidable accident charge not warranted where evidence showed that jury could find electric company negligent in failing to discover defect through prior knowledge or routine inspection of its lines).

notice to arise is ordinarily a question for the jury."[16] Although Beasley could not pinpoint how long the defect had existed, there is some evidence that Schuessler called an electrician to examine the frayed wire several days before Bennett's accident. Moreover, the fact that crews repairing the line did not find evidence of a cover or other insulation material in the area raises an inference that the exposed wire had existed for some time. Given this evidence and the fact that Schuessler may have called the Department shortly before the accident, we cannot say, as a matter of law, that the City defendants did not have constructive notice of the defect.

Lastly, the evidence does not demand a finding that Bennett assumed the risk of his injuries.[17] To establish the defense, a defendant must prove that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks.[18]

> Knowledge of the risk is the watchword of assumption of the risk, and means both actual and subjective knowledge on the plaintiff's part. The knowledge that a plaintiff who assumes a risk must subjectively possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes injury.[19]

In this case, though Bennett appreciated the general dangers associated with working around electrical wires, there is no evidence that he had a subjective knowledge or appreciation of the risk of electricity arcing from an exposed wire. Accordingly, the trial court did not err in denying the City defendants' motion for summary judgment.

*Judgment reversed in Case No. A07A1463. Judgment affirmed in Case No. A07A1464. Johnson, P. J., and Phipps, J., concur.*

DECIDED OCTOBER 19, 2007 ▮▮▮▮▮▮▮▮

*Smith, Welch & Brittain, Andrew J. Gebhardt,* for appellant (case no. A07A1463).

*Chambless, Higdon, Richardson, Katz & Griggs, Thomas F. Richardson, Jason D. Lewis,* for appellants (case no. A07A1464).

---

[16] (Citation and punctuation omitted.) *City of Atlanta v. Hightower,* 177 Ga. App. 140, 141 (338 SE2d 683) (1985).

[17] See, e.g., *Williams,* supra.

[18] See id. at 670 (1).

[19] (Punctuation and footnote omitted.) *Garner v. Rite Aid of Ga.,* 265 Ga. App. 737, 740 (595 SE2d 582) (2004).

*Bullard, Garcia & Wangerin, Kevin A. Wangerin*, for appellee.